IN THE COURT OF CRIMINAL APPEALS


OF TEXAS






NO. AP-76,413






EX PARTE CHRISTINA MARTINEZ, Applicant






ON APPLICATION FOR A WRIT OF HABEAS CORPUS


FROM SMITH COUNTY





 Meyers, J., delivered the opinion of the Court, in which Price, Womack,
Keasler, and Hervey, JJ., joined. Keller, P.J., and Johnson and Cochran, JJ.,
concurred.


O P I N I O N 



 Applicant was charged with capital murder as a party to the offense. A jury found
her guilty, and she was automatically sentenced to life imprisonment. On direct appeal,
the Twelfth Court of Appeals held that her trial counsel ("Counsel") had sufficiently
objected to all gang-related evidence to preserve appeal and that the trial court erred when
it overruled objections to all gang-related evidence, which was irrelevant and prejudicial. 
Martinez v. State (Martinez I), 147 S.W.3d 404 (Tex. App.--Tyler 2001). However, on
discretionary review, this Court determined that Counsel did not properly preserve his
objection, and we reversed the court of appeals. Martinez v. State (Martinez II), 98
S.W.3d 189 (Tex. Crim. App. 2003). Upon remand to consider the remaining issues, the
court of appeals affirmed Applicant's conviction and sentence. Martinez v. State
(Martinez III), 147 S.W.3d 412 (Tex. App.--Tyler 2004, pet. ref'd). Applicant filed an
application for writ of habeas corpus, claiming that she was denied effective
representation when her Counsel failed to object to the introduction of all gang-related
evidence. An evidentiary hearing was held on the writ application. The trial court
entered findings of fact and conclusions of law recommending that relief be denied. We
filed and set this application for writ of habeas corpus. We will hold that Counsel was
not ineffective, and we will deny relief.

I. FACTS (1) AND PROCEDURAL HISTORY 

 Appellant was at the lake with friends and acquaintances (Hersain Gomez, Susana
Arroyo, Armando Hinojosa, Michael Thompson, and Crystal Garcia) (2) when the victim
(Jeffrey Adam Carrier) and his passenger (Aaron Warren) approached them and inquired
about obtaining marijuana. The group advised the boys (3) to return later, when they would
help them. The group discussed a plan to rob the boys and also briefly discussed whether
to murder them. Upon their return, the group separated the boys in accord with their plan,
and the attack on the victim began. The victim was eventually subdued and dragged into
the woods. The beating continued, and the victim was stabbed with a knife. 

 Applicant was charged with capital murder as a party to the offense, where the
State did not seek the death penalty. She retained Counsel. 

A. Trial

 The jury convicted Applicant of capital murder as a party to the offense, and she
received a mandatory life sentence. Central to Applicant's claim of ineffective assistance
is the gang-related evidence introduced by the State. Other key evidence at trial included
Garcia's extensive testimony about the crime, and to corroborate that testimony, (4) the State
relied on a videotaped statement made by Applicant to the police and her grand jury
testimony. (5)

 Gang-related evidence: Prior to trial, Counsel filed a motion in limine asking to
exclude any evidence suggesting that Applicant and her co-defendants were in a gang. 
The State represented that it would introduce evidence that Applicant associated with
gang members, some of whom were involved in the murder at issue. The State also
asserted that it would call a detective to testify as a gang expert about gang activity in
general and the Northside Crips in particular. (6) It argued that such evidence was relevant
to show that Appellant should have known of her associates' violent tendencies and, thus,
should have anticipated that death would occur as a result of carrying out their plans. The
judge overruled the motion and limited the admissibility of the gang evidence to the
purpose of determining whether Applicant should have anticipated a murder. 

 At trial, Counsel objected to the first pieces of gang-related evidence offered by
the State. During direct examination of its key witness, Garcia, the State aimed to
establish that Applicant was affiliated with gang members by introducing two
photographs. Each showed Applicant standing next to a man with no connection to the
crime; the man had one arm around Applicant and the other exhibiting a gang sign. 
Counsel objected to the introduction of the photographs on the grounds of relevance and
prejudice. The judge overruled the objections and admitted the evidence. Counsel also
asked to take Garcia on voir dire with respect to the photographs, but the judge denied
that request. Garcia then explained that the man in the photograph associates with the
Bloods gang, and the gang sign depicted meant "crip killer."

 The State continued to question Garcia about gang-related topics. Garcia testified
that all six of the defendants associated with gangs, several with the Northside Crips
specifically. She also showed the jury her three-dot tattoo, which represented the phrase
"mi vida loca" or "my crazy life." Two other defendants, who too were associated with
gangs, had the same tattoo, although Garcia admitted that having the tattoo did not
necessarily mean that the person is in a gang. Further, Garcia demonstrated a gang hand
sign, and she explained that females are free to hang out with rival gangs without
problems, unlike males who generally stay with their particular gang. The only objection
by Counsel to the evidence of gang affiliation (presented after the two photographs) was
one challenging Garcia's expertise on gangs.

 During its closing argument, the State highlighted Applicant's alleged gang
involvement:

 You know, robberies are violent. Gang members are violent. And you
heard the gang testimony, and you can believe that she is an associate or a member
of the Northside Crips. I think it's pretty clear or Crystal Garcia made it real clear
that they don't carry cards saying, "I'm a gang member. I'm a member of the
Northside Crips. I get a special discount at the movies.["]

 It's clear. You've got a gang member throwing signs with his arm around
her neck. It's as clear as day that she's a gang member, and gang members are
violent.

 And people who talk about killing their victims after robbing the victims are
violent. And when people use knives and weapons and hit people over the head
with tire jacks, those are violent people. And people who give the murder
weapons to a man named Demon (7) is a violent act.

 And it shows her knowledge, and it shows her knowledge after seeing all
that she had seen, and she should have anticipated that death would occur. Real
simple. She should have anticipated death would occur. And she's guilty of
capital murder.


 Garcia's Additional Testimony: Apart from the gang-related evidence, Garcia
testified extensively as to the crime generally and Applicant's involvement specifically. 
She explained that the group, of which Applicant was a part, developed a plan to beat up
and rob the boys when they returned to buy marijuana, (8) and that Gomez later suggested,
once in Applicant's presence and again outside of her presence, that they kill the boys
because punishment was essentially the same for aggravated robbery. When the boys
returned, the group divided into two cars. Arroyo and Applicant rode with the boys in the
victim's car while the others rode in Hinojosa's car. 

 When the two cars finally stopped on a remote road, the boys were told that
Thompson would take the passenger to his (fictitious) uncle's house to buy marijuana. 
Hinojosa, Thompson, and the passenger then drove away, leaving the other individuals
behind with the victim. At that time, Garcia punctured one of the tires of the victim's car
pursuant to earlier directions from Gomez, directions of which Applicant was not aware. 
The attack on the victim began as he prepared to fix the flat tire. Applicant never
physically touched the victim, but she witnessed Gomez beat him while Arroyo struck
him with a car jack. After Gomez and Arroyo dragged the victim into the woods to
continue the beating, Garcia stole things from inside the vehicle while Applicant
attempted to conceal her involvement by wiping fingerprints from the car's exterior. (9) 
Also, Applicant had possession of the knife that had been used to deflate the tire of the
victim's car, and when asked for the knife by Gomez, Applicant handed it to Garcia with
instructions to give it to Gomez, who subsequently used it to stab the victim in the heart. 

 Subsequently, Hinojosa, Garcia, and Applicant left to find Thompson, who was
still with the passenger. They picked him up about a mile away and left the passenger
there. They then returned to collect Gomez and Arroyo, who were congratulating
themselves on the murder. Arroyo remarked, however, that Garcia and Applicant "didn't
do shit," and Applicant said she was glad she "didn't do nothing." Once reunited, the
group discussed how they might cover up the crime. Afterwards, still without calling the
police or 9-1-1, Applicant returned to her home. Garcia accompanied Applicant, who
rinsed their clothes and shoes in the sink. The girls later called a couple of friends to
come over, and they paid for the taxi with ten dollars that had been taken from the victim.

 Garcia's account of the murder did not go unchallenged by the defense. Counsel
brought out that Garcia had written a letter from the juvenile detention center stating "the
wrong people were locked up," including Applicant because she had not physically killed
the victim. Counsel also established that, while detained, Garcia told a young man that
Applicant "didn't have anything to do with this." In addition, Counsel questioned
Garcia's potential bias--although Garcia denied there was any deal in exchange for her
testimony, Counsel introduced evidence that the decision of whether to try Garcia as an
adult had been deferred until after her testimony in Applicant's case, and the prosecution
admitted that they would take into account the totality of her cooperation in this case
when determining her case's disposition. Finally, Counsel emphasized Garcia's lack of
credibility in his closing statement, highlighting that she was not completely consistent in
her testimony.

 Applicant's Videotaped Statement: The day after the murder, Applicant made a
statement to police, and the video recording of the interview was played for the jury at
trial. During the interview, Applicant denied that there had been any plan to rob the boys
or murder anyone. (10) However, there were many inconsistences to Applicant's account,
and as the interview progressed, she changed her story and ultimately admitted to not
being truthful during the initial portion of the interview. For example, Applicant claimed
not to know one co-defendant's name, but she later remembered his proper name as well
as his nickname. Also, she originally stated that she was using the bathroom in the woods
when the fight by the car occurred, but she subsequently admitted that she was, in fact, a
nearby witness to the altercation. Similarly, she initially denied going near the victim's
car when the victim was taken into the woods but ultimately confessed to wiping down
the car. In addition, Applicant denied early on that she had heard screaming from the
woods, but she finally conceded that she indeed heard the victim begging for his life. The
State, in its closing argument, stressed Applicant's dishonesty during the police interview:

 . . . The first 75 pages that you got to read along with, the first, whatever it
amounts to, three-quarters of this video she denies, denies, denies. 

 She didn't know anything about what was going on. She had no idea about
this robbery plan. She had no idea what had happened to Jeffery Adam Carrier
because when she came out of the woods, everyone was mysteriously gone. She
had no idea what was going on. 

 And then suddenly about to Page 75, it starts coming out, and it gets pulled
out, like pulling teeth. And finally, she says, "Yeah, I did hear the victim
screaming. I did hear Jeffery Carrier screaming, begging for his life."

 And then it comes out, "Well, yeah, I actually did see the fight, also." And
then, "Well, yes, I did wipe down the prints, fingerprints off that car. Yeah, I did
do that," but there is never an admission, never, not one time is there an admission
on this police video that there was ever a plan to rob Jeffery Adam Carrier . . . .


 Also during the video recording, Applicant denied knowing of any violent criminal
acts by the other defendants. But she claimed that she was afraid of some individuals in
the group, particularly Gomez. Applicant explained that she did not want to look in the
woods or elsewhere for the others because she was afraid of what she might see. 
Additionally, she asserted that she was not aware that anything was going to happen, but
she was scared because she "had seen a lot of stuff happen" and "thought the worst."

 When asked about the plan to buy marijuana, Applicant stated that she and Susie
rode in the victim's car after leaving the lake because the two of them were going to take
the boys to purchase it. This prompted the investigator to question why, if that was the
plan, did they not provide driving directions to the boys. Applicant responded that, after
the passenger got out of the victim's car and got into Hinojosa's car, she assumed that the
other car was going to buy the marijuana. (11) 

 Applicant's Grand Jury Testimony: The State offered into evidence a copy of
Applicant's grand jury testimony in which Applicant further described the events and
circumstances surrounding the murder. She explained that she was present when the
victim was initially struck by the tire and then the car jack, and although she turned away
so that she could not see, she heard fighting. When it became quiet, she turned back
around and discovered that the action had moved into the woods. Upon hearing
screaming coming from that direction, she walked into the woods to investigate. There,
she witnessed Gomez and Arroyo beating the victim as he screamed and begged for his
life. Applicant then returned to the car and wiped her prints from its exterior to remove
evidence of her presence at the scene. At that time, Gomez came out of the woods and
said, "Give me the knife." (12) Applicant admitted that, even though she had just seen him
beating the victim, she complied with Gomez's demand, after which he returned to the
woods. (13) Applicant also testified that she took the victim's cell phone from his car before
they "ever got anywhere"; that she found a watch in her purse but she had not put it there;
and that, when she returned home the night of the murder, she washed her jeans in case
there was blood on them. 

 Importantly, Applicant admitted that Gomez had, in fact, proposed that they rob
the boys, but she maintained that Gomez said they would do so only if everyone agreed. 
Because she had expressed disagreement with the plan, she did not believe that the
robbery was going to occur, much less a murder. When asked directly about her
suspicions of what was to occur when the boys returned, Applicant stated that she did
suspect that something would happen, but she was very drunk and confused. 

 A GRAND JUROR: Christina, I have a hard time trying -- trying to believe -- you
know, when you're in a group of people doing whatever you're doing, whether
you're going to a game or whatever, you're not -- when the car is split up, and
everybody gets in two separate cars, you're not asking like, "You know, what's
going on? What's going down?"


 THE WITNESS: Yeah. That's why I asked them, I said, "Why" -- I said, "Where
is -- where are they going?" And he said, "Well, they're going to buy some --
they're going to buy some weed from [Thompson's] uncle's house." So I figured,
well, we're just going to stay here and wait for them.


 A GRAND JUROR: But don't you -- I mean, when -- you knew what was going to
happen with -- what [Gomez] and [Arroyo] was going to -- I mean, you had to
suspect something was going to happen.


 THE WITNESS: Well, I --


 A GRAND JUROR: You had to know.


 THE WITNESS: Yeah, I kind of suspected something, but I was -- I was drunk. . .
. I knew, and then I didn't know, and then I was just --


 Q (By [the State]). You knew, but you didn't really want to -- the reality is you
really didn't want to know what was going down.


 A. Well, it was just like I knew, and then I was like, well, no, and then I -- it was
just -- it was very confusing. I mean, I wasn't sure they were going to do it, and
then at times I would think they were going to do it, and I just wasn't sure. I didn't
know.


 As she had in the videotaped interview, Applicant claimed that she had been afraid
of Gomez. She admitted that it crossed her mind to stop Gomez and Arroyo in the woods,
but she did not do so because they were all bigger than she, and that she was afraid for her
own life. Applicant also explained that she handed Gomez the knife because she was
afraid of what he would have done had she not complied with his request. She further
testified that Gomez threatened the group to keep quiet about the murder: "I'll kill any of
y'all if I ever hear that y'all say anything about this." Still, while Applicant contended
that she had not been hanging out with Arroyo recently because she had become "really
violent" and was "always trying to get into something," she stated that she knew Gomez
to be calmer (e.g., she had seen him in fights before but not recently).

B. Twelfth Court of Appeals

 On direct appeal to the Twelfth Court of Appeals, Applicant raised three issues. 
Martinez I, 147 S.W.3d at 404. For the first, Applicant argued that the evidence of gang
affiliation was improperly admitted, and the court of appeals agreed. The court, in a
footnote, stated that Counsel had sufficiently objected to all gang-related evidence and
preserved appeal when he had objected to the gang-related evidence upon its initial
introduction (i.e., the photographs). (14) Also, the court determined that the trial court erred
when it overruled Counsel's objections to all gang-related evidence because such
evidence was irrelevant, and if it was relevant, its relevance was substantially outweighed
by its prejudicial nature. 

 The court of appeals then held that Applicant was harmed by Counsel's error
because the gang-related evidence established the element of knowledge. Analyzing the
case under the harmless-error standard, (15) the court explained that, although the gang-related evidence was only a small percentage of the evidence introduced at trial, its
importance was great as it related to the knowledge element of the crime. The court also
highlighted that the State emphasized the erroneously admitted evidence during its
closing argument in an attempt to cause the jury to assume that the Crips were generally
known to engage in violent activities when no such evidence was in the record. Thus, it
believed "the likelihood that the jury placed a considerable amount of weight on
[Applicant's] gang association to be undeniable." Id. at 411. The court remanded the
case for a new trial. (16)

C. Court of Criminal Appeals

 We granted Applicant's petition for discretionary review. Martinez II, 98 S.W.3d
at 192. We held that Counsel failed to properly object to all gang-related evidence and,
thus, reversed the court of appeals. We noted that, while Counsel properly objected to the
introduction of the two photos specifically, he failed to object to the other gang-related
evidence. "[T]he objections to the challenged photos did not preserve error for all other
gang[-]related evidence" because they were objections directed specifically at the two
photographs. Also, Counsel's pre-trial motion in limine, which referred to the gang-related evidence generally, did not preserve the issue for appeal. Id. at 193. We did not
comment on the court of appeals's harm analysis.

 We remanded the case to the court of appeals for determination of Applicant's
other two grounds for appeal, and the court of appeals affirmed Applicant's conviction
and sentence. Martinez III, 147 S.W.3d at 420. (17)

D. Habeas Application

 Applicant filed a writ of habeas corpus, asserting that Counsel's failure to object
was below the standard of professional conduct and that, but for the deficient conduct,
she would have received a new trial as ordered by the court of appeals. 

 An evidentiary hearing was held on the writ application. (18) Counsel took the stand,
but he could not remember much from the trial because it had taken place ten years prior. 
Counsel testified that he did not recall his exact thought processes at the time of trial, but
he believed that it was possible that he made a conscious decision not to continue to
object to the gang-related testimony. He explained that such decision could have been a
strategic move because he did not want to call further attention to or emphasize the gang-related testimony in front of the jury, especially when the court had overruled his
objection to other gang-related evidence. Further, he did not think that it would have
impacted the verdict if he had continued to object to the gang-related evidence because he
believed that the State's sponsoring witness, Garcia, was not very credible. Counsel did
indicate a mistaken belief that a running objection was made, admitting that such an
objection would have preserved the issue for appeal, but he did not know how it would
have influenced the jury's decision.

 The trial court entered findings of facts and conclusions of law, suggesting that we
deny relief for this writ of habeas corpus. We will agree and will deny relief. 

II. CASELAW

 A defendant has a Sixth Amendment right to effective assistance of counsel. U.S.
Const. amend. VI. An attorney's function "is to make the adversarial testing process
work in the particular case." Strickland v. Washington, 466 U.S. 668, 690 (1984). To
determine whether to grant habeas corpus relief for ineffective assistance of counsel,
Texas courts apply the standard set forth in Strickland, which requires the applicant to
establish two components. (19) See Hernandez v. State, 726 S.W.2d 53 (Tex. Crim. App.
1986). 

 First, the applicant must show that her attorney's performance was deficient,
meaning it "fell below an objective standard of reasonableness . . . under prevailing
professional norms" and according to the necessity of the case. Strickland, 466 U.S. at
687-88; Ex parte Morrow, 952 S.W.2d 530, 536 (Tex. Crim. App. 1997) (en banc). 
Because there "are countless ways to provide effective assistance in any given case," a
reviewing court must be highly deferential and "indulge a strong presumption that
counsel's conduct falls within the wide range of reasonable professional assistance; that
is, the defendant must overcome the presumption that, under the circumstances, the
challenged action might be considered sound trial strategy." Strickland, 466 U.S. at 689
(quotation marks omitted).

 Second, the applicant must demonstrate that she was prejudiced by her attorney's
performance. That is, taking into account the totality of the evidence before the judge or
jury, "there is a reasonable probability (20) that, but for counsel's unprofessional errors, the
result of the proceeding would have been different." Id. at 694, 696. Thus, an applicant
must show "that counsel's errors were so serious as to deprive defendant of a fair trial, a
trial whose result was reliable." Id. at 687. It is not sufficient for Applicant to show "that
the errors had some conceivable effect on the outcome of the proceeding." Id. at 693. 
Rather, she must show that "there is a reasonable probability that, absent the errors, the
factfinder would have had a reasonable doubt respecting guilt." Id. at 695.

 To successfully assert that trial counsel's failure to object amounted to ineffective
assistance, the applicant must show that the trial judge would have committed error in
overruling such an objection. Ex parte White, 160 S.W.3d 46, 53 (Tex. Crim. App.
2004); Vaughn v. State, 931 S.W.2d 564, 566 (Tex. Crim. App. 1996).

 The applicant has the burden to prove ineffective assistance of counsel by a
preponderance of the evidence. Thompson v. State, 9 S.W.3d 808, 813 (Tex. Crim. App.
1999). Allegations of ineffectiveness must be based on the record, and the presumption
of a sound trial strategy cannot be overcome absent evidence in the record of the
attorney's reasons for his conduct. Busby v. State, 990 S.W.2d 263, 269 (Tex. Crim. App.
1999). The reviewing court must look to the totality of the representation, and its
decision must be based on the facts of the particular case, viewed at the time of counsel's
conduct so as to eliminate hindsight bias. Strickland, 466 U.S. at 690. In all cases, the
"ultimate focus of inquiry must be on the fundamental fairness of the proceeding." Id. at
696.

III. ANALYSIS

 Applicant claims that she received ineffective assistance of counsel at trial. 
Applicant contends that Counsel's performance fell below the objectively reasonable
standard because he neither continued to object to the gang-related evidence nor obtained
a running objection to the same. She further argues that, but for the deficient conduct, she
would have received a new trial as ordered by the court of appeals. 

 The two prongs of Strickland need not be analyzed in a particular order, and we
turn first to the prejudice prong. See id. at 697. We must determine whether, in the
context of the overall record, Applicant has shown by a preponderance of the evidence
that Counsel's deficiency so compromised the proper functioning of the adversarial
process that the trial court cannot be said to have produced a reliable result. Id. at 686. In
its findings of fact and suggested conclusions of law, the trial court determined that the
evidence, even if the gang-related evidence had not been admitted, was sufficient to
support the jury's guilty verdict, and that the result of trial would not have been different
but for Counsel's failure to object to the gang-related evidence. We agree and conclude
the Applicant has not met the prejudice prong of the Strickland test.

 A person can be convicted of capital murder as a party to the offense, without
having had the intent to commit the murder. Tex. Penal Code Ann. § 7.02(b); Johnson
v. State, 853 S.W.2d 527, 535 (Tex. Crim. App. 1992). A defendant is guilty as a party to
an offense if the offense is committed by the conduct of another for which she is
criminally responsible. Tex. Penal Code Ann. § 7.01(a). Specifically, "[i]f in the
attempt to carry out a conspiracy to commit one felony, another felony is committed by
one of the conspirators, all conspirators are guilty of the felony actually committed,
though having no intent to commit it, if the offense was committed in furtherance of the
unlawful purpose and was one that should have been anticipated as a result of the
carrying out of the conspiracy." Tex. Penal Code Ann. § 7.02(b). In this case,
therefore, Applicant may be convicted of capital murder as a party to the offense if the
jury found that (1) Applicant conspired with the group to commit robbery, (21) (2) the
murder occurred in furtherance of the robbery, and (3) the murder should have been
anticipated as a result of carrying out the robbery. See Ex parte Thompson, 179 S.W.3d
549, 552 (Tex. Crim. App. 2005).

 When the gang-related evidence is disregarded, the remaining evidence against
Applicant, in its totality, is strong and would support a finding by the jury that Applicant
was a party to the offense. There was evidence, inter alia, that Applicant was present
before, during, and after the murder; that she was afraid of some individuals of the group;
that she was aware that there was a plan to rob the boys if everyone were in agreement;
that she took the victim's cell phone from his car; that she was present during the fight
between Gomez, Arroyo, and the victim; that she witnessed Gomez and Arroyo beating
the victim in the woods; that she handled the knife (the murder weapon); that she gave the
knife to Garcia with instructions to give it to Gomez, who then stabbed the victim; and
that she attempted to destroy evidence by wiping fingerprints from the car and washing
any blood from her clothes. (22) 

 We acknowledge that gang-related evidence tends to be irrelevant and prejudicial
if not accompanied by testimony that puts the evidence into context. Dawson v.
Delaware, 503 U.S. 159 (1992). In Dawson, the Supreme Court held that the First
Amendment prohibited evidence of the defendant's membership in the Aryan
Brotherhood during the penalty hearing because merely belonging to a group proved
nothing more than the defendant's abstract beliefs. Id. at 166. Had the prosecution, as it
originally indicated it would, called an expert to testify that the Aryan Brotherhood was a
prison gang "associated with drugs and violent escape attempts" that advocated "the
murder of fellow inmates," the result might have been different. Id. at 165. Without such
evidence, however, the defendant's membership was irrelevant, and it was likely
"employed simply because the jury would find these beliefs morally reprehensible." Id. at
167. 

 Like Dawson, the State in this case informed the trial court that it would introduce
evidence of the Northside Crips' violent activities through a gang expert, thus linking the
group membership to the specific crime. But the State presented the evidence of group
membership without any such accompanying testimony of the violent activities of the
gang. Thus, as in Dawson, the jury heard evidence of group association without any
context in which to place it. 

 Still, here the "amount of gang-related evidence was only a small percentage of the
total evidence introduced during the trial of the case." Martinez I, 147 S.W.3d at 411. 
The court of appeals stated that as "it related to other evidence arguably supportive of the
knowledge element, its percentage was much greater," but even if that is true, the
significance of the other evidence should not be ignored or downplayed. Strickland
requires that we look at the totality of the evidence, and in doing so, we believe that the
evidence, even if the gang-related evidence had not been admitted, was sufficient to
support the jury's guilty verdict.

 We cannot ignore that the Twelfth Court of Appeals held that the admission of the
gang-related evidence harmed Applicant at trial. Martinez I, 147 S.W.3d at 410-12. 
However, the Strickland prejudice prong applied today presents a more difficult burden
than does the harm analysis under Rule 44.2 of the Texas Rules of Appellate Procedure,
which the court of appeals applied. Rule 44.2(b) for non-constitutional errors provides
that "a conviction should not be overturned if the appellate court, after examining the
record as whole, has fair assurance that the error did not influence the jury, or had but a
slight effect." Martinez I, 147 S.W.3d at 41; see Johnson v. State, 967 S.W.2d 410, 417
(Tex. Crim. App. 1998). In contrast, the prejudice prong of Strickland requires that we
look to the totality of the circumstances and evidence presented to determine if there is a
reasonable probability that, but for Counsel's deficient performance, the result of the
proceeding would have been different. Strickland, 466 U.S. at 694. Presiding Judge
Keller has compared the two standards: 

 . . . if the error is ineffective assistance of counsel, in order to prevail appellant
must meet the second prong of Strickland, i.e., he must meet the burden of
establishing harm. If he meets that prong, he has exceeded what he needs to prove
under either (a) or (b) of the harmless error rule, and he gets relief. Appellant
would actually be better off if this is non-constitutional error because in that case
his burden is less than the burden imposed by the second prong of Strickland.


Williams v. State, 958 S.W.2d 186, 198 (Tex. Crim. App. 1997) (en banc) (Keller, J.,
dissenting). We do not address the court of appeals's harm analysis today, but even
supposing the court of appeals was correct in holding that Applicant was harmed, it is not
inconsistent for us to hold that Applicant has not proven prejudice under Strickland. (23)

 We conclude that the record does not support the conclusion that Applicant met
the second prong of the Strickland test. There was ample evidence to support a
reasonable jury's finding of guilt. We cannot say that there is a reasonable probability
that the outcome would have been different if Counsel had objected to all of the gang-related evidence. It is unlikely, in the face of all the evidence with which the jury was
presented, that the jury would have reached a different conclusion in the absence of the
gang-related evidence, and so we need not address the first prong of Strickland.

IV. CONCLUSION

 We conclude that Applicant has not proven by a preponderance of the evidence
that she was prejudiced by Counsel's performance. Therefore, Appellant has failed to
demonstrate that she received ineffective assistance of counsel. Relief is denied.

 Meyers, J.

Delivered: 01/12/2011

Publish
1. For a more detailed version of the facts of the crime, see Martinez I, 147 S.W.3d at 406-09; Martinez II, 98 S.W.3d at 191; and Martinez III, 147 S.W.3d at 413-17.
2. These individuals are referred to collectively as "the group." Garcia and Gomez pled
guilty to capital murder, and Arroyo was found guilty of the same. Hinojosa and Thompson were
convicted of capital murder as a party to the offense. All defendants received an automatic life
sentence, except for Garcia who was sentenced to 20 years as a juvenile.
3. The victim and his passenger are referred to as "the boys."
4. Garcia was an accomplice as a matter of law. See Burns v. State, 703 S.W.2d 649, 651
(Tex. Crim. App. 1985) (stating that a person who has been indicted for the same offense is an
accomplice witness as a matter of law). "A conviction cannot be had upon the testimony of an
accomplice unless corroborated by other evidence tending to connect the defendant with the
offense committed; and the corroboration is not sufficient if it merely shows the commission of
the offense." Tex. Code Crim. Proc. Ann. art. 38.14. The accused's presence in the
accomplice's company before, during, and after the commission of the offense, coupled with
other suspicious circumstances, may tend to connect the accused to the offense. Dowthitt v.
State, 931 S.W.2d 244, 249 (Tex. Crim. App. 1996). A defendant's confession may be sufficient
to corroborate the testimony of an accomplice, if proof of the confession does not depend on the
testimony of the accomplice. Farris v. State, 819 S.W.2d 490, 495 (Tex. Crim. App. 1990).
5. The investigators, detectives, criminologist, medical examiner, and police involved in
the case also testified.
6. The State did not call the detective to testify.
7. "Demon" is Gomez's nickname.
8. According to Garcia's testimony, no one opposed the plan to rob the boys when Gomez
brought up the idea, but the only person that expressly agreed to it was Arroyo. Also, Garcia
stated that they never planned to actually help the boys obtain marijuana.
9. During this time, Garcia went into the woods and demanded that the victim give her his
wallet. 
10. Interestingly, during the interview, Applicant did not admit that there was talk of killing
the boys, did not mention going into the woods and seeing the victim's body, did not admit
seeing the objects or weapons being used against the victim, and did not confess to turning over
the murder weapon. These details would be addressed in Applicant's grand jury testimony.
11. During her grand jury testimony, Applicant explained that, of the group, she, Arroyo,
and Garcia would normally buy marijuana, but Thompson used to know who sold it. 
12. Applicant testified that she had originally taken the paring-type knife from Garcia's
house a few days prior. On the day of the crime, the group had been playing with the knife while
at the lake, so Gomez was aware that Applicant had it.
13. There is some discrepancy between Applicant's grand jury testimony and Garcia's
testimony as to whether Applicant gave the knife directly to Gomez or, instead, gave it to Garcia
with instructions to hand it to Gomez. Regardless, the evidence supports that Applicant was
aware of Gomez's demand, and she complied with it.
14. "By objection to the gang-related evidence upon its initial introduction, [Applicant]
preserved error and was not required to iterate this objection." Martinez I, 147 S.W.3d at 408
n.5.
15. Tex. R. App. P. 44.2(b) ("Any other error, defect, irregularity, or variance that does not
affect substantial rights must be disregarded."); see Martinez I, 147 S.W.3d at 411. 
16. Based on its evaluation of the first issue, the court of appeals did not think it necessary
to address the second and third issues.
17. The court of appeals held that (1) the trial court did not abuse its discretion in denying
the motion to suppress Applicant's videotaped confession and (2) Applicant had not preserved
the error, if any, for appellate review regarding the trial court informing the jury that it had
overruled Applicant's objection to the State's attempt to offer Applicant's grand jury testimony,
which had occurred outside the jury's presence. Martinez III, 147 S.W.3d at 417-20.
18. Applicant was present but did not testify.
19. The two prongs of Strickland need not be analyzed in a particular order--the prejudice
prong may be analyzed first and the performance prong second.
20. "A reasonable probability is a probability sufficient to undermine confidence in the
outcome." Strickland, 466 U.S. at 694.
21. Section 15.02(a)-(b) of the Texas Penal Code provides that 

 (a) A person commits criminal conspiracy if, with intent that a felony be committed:
(1) he agrees with one or more persons that they or one or more of them engage in
conduct that would constitute the offense; and
(2) he or one or more of them performs an overt act in pursuance of the
agreement.

 (b) An agreement constituting a conspiracy may be inferred from acts of the parties.
22. In her brief submitted to the Twelfth Court of Appeals during the initial proceedings,
Applicant's statement of facts discussed Garcia's testimony (without mention of the gang-related
evidence), Applicant's videotaped statement to police, and Applicant's grand jury testimony. 
Then, she wrote that, in summarizing the facts as she did, she was "forced to concede that this
evidence was legally sufficient to convict her, primarily because of her own statements to the
police and to the grand jury. In making this concession, however, [Applicant] continues to
maintain her innocence." (citations omitted). Her claim of innocence is based on the arguments
that, in addition to the gang-related evidence being improperly admitted, the videotaped
statement to the police was improperly admitted and the trial court committed fundamental error
in advising the jury that the court had overruled Applicant's objection to the introduction of her
grand jury testimony, which had been made outside the jury's presence. The Twelfth Court of
Appeals rejected those arguments. See Martinez III, 147 S.W.3d at 417-20. Therefore,
Applicant would seemingly concede that the evidence, sans the gang-related evidence, would be
sufficient to support the jury's verdict, and the result of the proceeding would not be different if
Counsel had objected to the gang-related evidence.
23. Applicant contends that, had Counsel properly objected to the introduction of all the
gang-related evidence, this Court would not have reversed the ruling of the court of appeals, and
she would have received a new trial as ordered by the court of appeals. While this may be true,
Applicant overlooks the differences between the Rule 44.2 harm analysis and the Strickland
standard applied today.