**Opinion issued December 22, 2015**



In The

# Court of Appeals

For The

# First District of Texas

_____

## NO. 01-14-00824-CR

_____

**KEVIN WIMES, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 339th District Court**
**Harris County, Texas**
**Trial Court Case No. 1431168**

---

## MEMORANDUM OPINION

Appellant Kevin Wimes was convicted of aggravated sexual assault of a child younger than fourteen years of age, and he was sentenced to 40 years' confinement. In three points of error, he complains that his trial counsel provided ineffective assistance. We affirm.

## BACKGROUND

The allegations against appellant in this case are that he sexually assaulted his daughter, Jane.[1]

### A. State's case

Jane's mother, Lacrisa, testified that she is the mother of five children, three boys and two girls, and that she has lived in Florida since 1997. She is now married and a stay-at-home mom.

Lacrisa met appellant in 1997, and they dated for three years. They had two daughters during their relationship, Jane and her younger sister, Ann. Lacrisa and appellant broke off their relationship when Jane was three and Ann was two. After their break-up, appellant moved to Texas. He did not financial support the girls, and he only saw them once or twice over a period of years.

In September 2008—when Jane was starting the fourth grade and Ann was starting the third grade— appellant came back into their life. Lacrisa testified that it was at a very hard financial time in her life; their car was being repossessed, they were being evicted, and she could not pay their utility bills. Appellant explained to her that he had gotten his life together in Texas, had a stable place to stay, and a "young lady that is helping him out." They agreed that appellant could take the girls back to Texas for a while to live with him until Lacrisa got financially

---

[1] We use pseudenyms for minors in this opinion. *See* Tex. R. App. P. 9.10(a)(3).

2

situated. While the girls were in Texas, Lacrisa lived in a hotel room with one pull-out bed with her husband and other three kids for the first one and one-half years, and then they got an apartment. She testified that it was a difficult choice letting the girls move to Texas with their father, but she believed they would have stability and resources that she lacked at home.

While the two girls were with appellant in Texas, Lacrisa and the girls spoke on the phone regularly. Appellant also sent Lacrisa pictures of the girls a couple of times. Lacrisa thought the girls appeared happy. She never got a sense from the girls during her conversations that there was anything wrong, and she never heard any allegations of abuse.

At one point, Jane called Lacrisa and said that she was ready to come home. Lacrisa and her husband were already settled into their apartment and more financially stable, so they welcomed the opportunity for the girls to move back. In July 2010, Lacrisa and her husband drove the thirteen hours to Baytown, Texas, where appellant and the girls were living, and checked into a hotel to rest because they were tired from the drive. Appellant then started calling Lacrisa, saying: "Bitch, come get these kids." She and her husband immediately went to appellant's house.

When they arrived at appellant's house, he was "intoxicated, in the street, yelling bitches and whores, and acting like he wanted to fight." Several of

3

appellant's friends were also out in the street, as well and Jane and Ann. Lacrisa got her girls into the car, they stayed the night at a hotel, and then returned to Florida. When they got home, Lacrisa asked the girls if "anyone had touched them inappropriately, and they stated no." That question was prompted by the fact that when she arrived at appellant's house to pick the girls up, there were "just several guys hanging outside . . . drinking; and something just didn't look right." She felt there were too many men and that her daughters were dressed in inappropriate tight shorts that she would never have dressed them in.

The girls settled back into school in Florida, and their relationship with their mother was alright, although Ann was somewhat withdrawn. Lacrisa testified that she believed it was caused by the transition from Texas to Florida. After the girls moved back to Florida, they talked to appellant on the phone a couple of times.

Something came to her attention on January 7, 2011 that caused Lacrisa to ask Jane if she had been sexually abused. Jane responded yes, and Lacrisa called 911. She was told that if the abuse took place in Texas, she would have to call a Child Abuse line, which she did. The next morning, Florida Department of Children and Families (DCF) caseworkers came to their apartment to explain the investigation process. They set up a forensic pathologist appointment for the girls, and a medical appointment for them to be examined. Jane also started therapy.

4

The Baytown Texas Police Department also opened an investigation. Detective Crowell, the investigating officer, worked in the Crimes Against Children Division and testified that he had received training involving investigation, case management, and child interview techniques. He also attended continuing education courses on child sexual assault investigations.

Crowell's involvement in appellant's case began when he received an initial Child Protective Services (CPS) report alleging sexual conduct between Jane and appellant. He also received a case file from the sheriff's office in Florida, which contained the original offense report, and supplemental reports, and medical and interview-type paperwork relating to the investigation of Jane's allegations. He contacted Lacrisa and the people who conducted the Florida investigation. When Crowell reached out to him, appellant provided a verbal statement. Eventually, Crowell decided that the case warranted presentation to the district attorneys' office, and he issued a warrant for appellant's arrest.

Jane testified at trial. At the time of trial in September 2014, she was 15years old. She testified that the first time she recalls meeting her father was the beginning of the fourth grade, when she was nine years old and he came to visit in Florida. She and her sister then rode on a bus with appellant to Texas. She was excited because Baytown was a new town and she was excited to see her father. When they arrived, Jane first lived in a one-bedroom apartment with her sister

5

Ann, appellant, and appellant's wife, Latoyia. Appellant and his wife slept in the bedroom, and Jane and Amy slept on an air mattress on the floor. After that apartment, they moved to a different one-bedroom apartment, and eventually to a three-bedroom apartment. Finally, they moved into a house, and then later to a different house.

Jane testified that "something bad" happened to her while she was living in Baytown. The first time "something bad" happened was when she was 10 years old, they were living in the second one-bedroom apartment, and it was Christmas. It was dark outside, and after midnight. She was there with Ann, appellant, Latoyia, and her cousin, Jack. Jack and Ann were asleep, and Latoyia was in her room. Jane testified that she was sitting on the couch and appellant came out and asked if she wanted to go with him to a friend's apartment in the same complex to get some picture frames. When they got to the apartment, it was dark, empty, and Jane could tell that the person who had lived there had moved out.

Rather than pick up the frames, appellant took Jane into the bedroom and said they "were just going to lay down for a little bit." When they laid down side-by-side, appellant told Jane to get on top of him. After Jane complied, appellant started talking about Lacrisa and asking if Jane wanted to move back home to Florida. Jane answered "no" because she had not been in Texas that long and was happy there. Appellant told Jane that was good because her mother "doesn't love

6

me the way he does." Appellant then told Jane to rock back and forth on top of him while she was sitting on his chest. Jane testified that appellant then "put his hands on my waist and pushed me down on his parts." With the aid of a male doll, Jane identified appellant's "parts" as his penis.

Jane testified that appellant then went into the bathroom to pee, and returned with his pants pulled down. At this point Jane was scared because she "knew something bad was going to happen." She thought about running, but was scared she would not get far. Appelant pulled Jane up on her knees and told her to put his penis in her mouth while he held onto the back of her head with his hands. She testified to what his penis looked like and that she complied. After a while he stopped and pulled his pants back up. When they walked back to their apartment, Ann and Jack were still asleep and Latoyia was still in her bedroom awake, as Jane heard her laugh when appellant went into the bedroom. Jane went back to the couch. Ten minutes later, appellant came back out of the bedroom and took Jane back to the empty apartment.

When they got there, appellant told Jane to take her pants off. Appellant took Jane into a bedroom closet, got on top of her, and "put his parts inside of me." Using an anatomically correct doll, Jane testified that appellant penetrated her vagina. Appellant used his hands to put his penis partway inside of her, and she could feel something wet coming outside of her vagina.

7

When they put their clothes back on and left, appellant told her he would tell her what he got her for Christmas. That did not make her feel better, and she was still in a lot of physical pain when they got back to their apartment, but it did not last very long. She and appellant never discussed what happened, and nothing happened again while they were still living in that one-bedroom apartment. She did not think anything like that would happen again.

Jane testified that after they moved into the three-bedroom apartment, appellant came and got her out of her bedroom one night and took her into his bedroom. Her step-mother was at work, so they were alone in appellant's room. He told her to lie down on the bed, to take her pants off; he pulled his penis out of his boxer shorts and again penetrated her vagina. She testified that it hurt and again she felt something moist coming out of her body. She was supposed to go to church the next morning with her aunt, but did not because she felt like she could not walk and did not have feeling in one leg. Her aunt returned her to her apartment after she collapsed and wanted to take her for medical attention, but appellant said no, that she was alright and took Jane and Ann inside and shut the door. There were no more incidents while they lived at that three-bedroom apartment.

When they next moved into their first house, Jane testified that there were no incidents of appellant touching her there. When they moved into their last house,

Jane testified that the incidents started up again. Latoyia stayed with her mother Monday through Friday so that she would not have to drive so far to work during the week. When she was gone, Jane testified that appellant would come into the room she shared with sister in the middle of the night to get her. More than once he did this and took her to his bedroom and told her to put his penis in her mouth. He did not penetrate her vagina at any point while they lived at that house, but sometimes he would make her kiss him, "Like, make-out kiss."

Jane testified that she never told her mother on the phone that anything was wrong because she and Ann were only allowed to talk on the phone with their mother when they were in appellant's room where he could hear them. She never considered telling Latoyia what was going on because she would "just go back and tell him; and then he would just deny it, and we would get in trouble for it."

She said she first disclosed to her mother what had happened after they moved back to Florida and were watching an episode of "Law and Order" that involved sexual abuse. Her mother immediately broke down and cried. She did not tell her mother any details about any of the incidents. She did explain the details with others, such as the forensic interviewer, and the doctor that examined her.

Jane testified that she never said "no" over the years these incidents happened because she felt she was small and did not have a choice. She reached

9

the point that she no longer enjoyed living with her father because she did not feel safe having to wonder every night about the next time he was going to come into her room. Jane was cross-examined about why she gave more details about more incidents during her court testimony than during her initial interviews.

Doctor Danielle Madera, a psychologist with the Harris County Children's Assessment Center also testified. She previously worked as a child forensic interviewer in Florida, working with children dealing with physical and sexual abuse. Madera explained that oftentimes during the forensic interviews, there is only partial disclosure, and that more information comes out over time. Also, they are constrained during the interviews by only being able to answer neutral, fact-gathering questions that are asked, but not cover every scenario. She testified to her opinion that Jane's demeanor in court was "very consistent with a child that's been sexually abused and traumatized and now faced with sitting in the room with a person who raped her." She testified that she had not "completed any studies, case studies, research, anything like that with regard to children's performance in a courtroom," but that she has "had a chance to observe children testify previously." On cross-examination, she conceded it was possible that Jane "appeared traumatized on the witness stand" because she "just couldn't face her father if she wasn't being truthful." She also clarified that she doesn't not know if Jane was the victim of sexual abuse or not, and that she was not testifying as to an opinion of

that. She believes the way in which Jane "articulated herself is consistent with sexual abuse," but that "the only two people that know whether or not that incident happened are the victim and defendant."

Finally, the State called Ms. Rita Deorio, who testified that she lives in North Carolina, and that the police and USAA fraud department are currently investigating how a $2,500 check was issued from her account to appellant. She has never met appellant and did not write him a check.

## B.    Appellant's case

Jane's cousin Kenny testified on appellant's behalf. He and appellant are the same age, and Kenny lived with appellant off-and-on over the years. He testified that on Christmas Eve 2008—the night of Jane's first allegation—he was on the apartment porch drinking with friends until at least 1:00 a.m. Christmas morning. He usually slept on the couch at that apartment, but gave no specific testimony about where he slept that night. He testified to his belief that things seemed "normal" between appellant and Jane when he lived with appellant.

Appellant also called Dr. Rebecca Girardet, a child-abuse pediatrician who leads the division of Child Protection Pediatrics at the University of Texas Medical School. She testified that "approximately 95 percent of children presenting for sexual abuse don't have any physical signs of trauma." She explained that genital and anal tissues heal quickly, and oftentimes completely without scarring. Pre-

11

puberty scars are much harder to detect once a girl goes through puberty due to estrogen changes. Girardet testified that she reviewed Jane's original examiner's report and the photographs from that exam. The report stated there were tears in the hymen; but it is not clear from the photographs if the hymen had tears or there were folds, because when hymens estrogenize, they get folds. In her experience, tears in a child can only be caused by penetrating trauma. She clarified that activities like riding a bike and taking "straddle falls" may cause bruising of the outer labia, but not affect the interior protected area.

Appellant called Sonya Scott with CPS who opened a 2009 physical abuse case regarding Jane. Her records indicate that Jane's initial outcry was to school staff. Scott visited the home and Jane denied the outcry. Scott did not see anything of concern in the home. After talking to appellant, Jane, Ann, Scott, and school staff, Scott closed the investigation based on lack of evidence to support the allegation. Both Jane and Ann denied physical or sexual abuse. Jane reported that she was happy.

Finally, appellant testified on his own behalf. He testified that when he and Lacrisa split up, the girls were in CPS care. While he did not take Jane and Ann when he split from their mother, he talked to them on the phone occasionally. He testified that he went and got them some weekends when he still lived in Florida before he moved to Texas in 2002. He saw them once after he moved, in 2005, for

his father's funeral in Georgia. He next saw the girls in 2008 when he visited relatives in Florida, and his cousin took him to see Lacrisa and his daughters. Later that weekend, Lacrisa and he agreed that he could offer the girls more stability in Texas, so they would return home with him.

He testified that on Christmas Eve of 2008—the night Jane alleged the first abuse happened—the girls each opened one gift at midnight while appellant and Latoyia were cooking for the next day. Kenny and several friends were outside at that time. According to appellant, the girls then went to sleep about 1:30 or 2:00 am.

He testified that he received a home visit from CPS in 2009, and that he cooperated. According to appellant, the girls could talk to their mother privately on the phone whenever they wanted. He also claimed that in 2010, when Lacrisa came to pick up the girls, they were just going with her for a summer visit—not to move back to Florida.

He first heard the allegations about sexually assaulting Jane in January of 2011 through a phone call from Lacrisa. Appellant was "upset and furious." He was upset because his "daughters were sexually molested," but he "kn[e]w it wasn't from me." He denied the allegations, but advised Lacrisa to take the girls directly to the hospital.

Appellant believes that Jane accused him of sexual assault because "she was told to do it." He believes that Lacrisa was angry about appellant taking tax deductions for the girls when Lacrisa wanted to take the tax deductions. He and Lacrisa argued about this topic before the sexual assault allegations came up.

Appellant testified that he loves his daughters and would never hurt them. It hurt him to see Jane testify because "they still putting her though all this," and because "they is someone that's making her say all these things, because I know my daughter." He testified that he never touched Jane in a sexual way, and never asked Jane to touch him in a sexual way. He has no idea what Jane is talking about with the empty apartment or the frames that they were supposedly supposed to collect. He testified that Jane was not truthful in her testimony about the sexual assaults.

He first testified to his belief that Jane was sexually assaulted by someone else in Florida, if she was sexually abused at all. He later testified to his belief that she was actually making the whole thing up. From his perspective, Lacrisa convinced Jane to lie because Lacrisa was motivated by wanting to keep the girls so she could collect tax refunds associated with the girls if they stayed with her.

## ISSUES ON APPEAL

Appellant complains his trial counsel was ineffective in three points of error:

1.      "Appellant received ineffective assistance of counsel when counsel failed to object to the expert testimony of the State's

14

expert that the courtroom behavior of the complainant was consistent with a child who has been abused and is sitting in the courtroom with a person who raped her."

2. "Appellant received ineffective assistance of counsel when counsel failed to object to the expert testimony of the State's expert that in effect gave the opinion the complainant was telling the truth."

3. "Appellant received ineffective assistance of counsel when counsel failed to attack the testimony of the State's expert by requesting a hearing on the admissibility of the testimony when the expert testified there were no studies to support her opinion."

## STANDARD OF REVIEW

We consider claims of ineffective assistance of counsel under the two-prong test adopted in *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064 (1984). To prevail on an ineffective assistance of counsel claim, appellant must show that (1) counsel's performance was deficient, meaning it fell below an objective standard of reasonableness, and (2) the deficiency prejudiced the defendant, meaning there was a reasonable probability that, but for the counsel's deficient performance, the results of the trial would have been different. *Id*.; *Ex parte Napper*, 322 S.W.3d 202, 246, 248 (Tex. Crim. App. 2010). The burden is on appellant to prove by a preponderance of the evidence that counsel was ineffective. *See Bone v. State*, 77 S.W.3d 828, 833 (Tex. Crim. App. 2002).

The first prong of Strickland requires that the challenged acts or omissions of counsel fall below the objective standard of professional competence under

15

prevailing professional norms. *Perez v. State*, 310 S.W.3d 890, 893 (Tex. Crim. App. 2010). Appellate courts are highly deferential to trial counsel and avoid evaluating counsel's conduct in hindsight. *Ingham v. State*, 679 S.W.2d 503, 509 (Tex. Crim. App. 1984). Thus, courts must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Strickland*, 466 U.S. at 689, 104 S. Ct. at 2061.

The second prong of *Strickland* requires a reasonable probability that the outcome of the case would have been different. *Id.* at 694, 104 S. Ct. 2068. A reasonable probability is a probability sufficient to undermine confidence in the outcome, meaning that counsel's errors must be so serious that they deprive appellant of a fair trial. *Smith v. State*, 286 S.W.3d 333, 340–41 (Tex. Crim. App. 2009).

Allegations of ineffectiveness must be firmly founded in the record, and the record must affirmatively demonstrate the ineffectiveness. *Mallett v. State*, 65 S.W.3d 59, 63 (Tex. Crim. App. 2001). "In the rare case in which trial counsel's ineffectiveness is apparent from the record, an appellate court may address and dispose of the claim on direct appeal." *Lopez v. State*, 343 S.W.3d 137, 143 (Tex. Crim. App. 2011). When the record is silent as to the reasoning behind an alleged

deficiency by trial counsel, "we will assume that counsel had a strategy if any reasonable sound strategic motivation can be imagined." *Id.*; *see also Garcia v. State*, 57 S.W.3d 436, 440 (Tex. Crim. App. 2001) ("[I]n the absence of evidence of counsel's reasons for the challenged conduct, an appellate court . . . will not conclude the challenged conduct constituted deficient performance unless the conduct was so outrageous that no competent attorney would have engaged in it.").

## ANALYSIS

All three of appellant's issues involve complaints about counsel's handling of Dr. Madera's testimony. The constitutional right to counsel in a criminal prosecution exists to protect the fundamental right to a fair trial. *Strickland*, 466 U.S. at 684, 104 S. Ct. at 2063. The crux of appellant's three points of error boils down to the complaints that (1) Madera's statement that Jane's courtroom demeanor was "consistent with" a child who has been sexual abused was an unobjected-to, improper comment on Jane's credibility, and (2) that counsel should have requested a hearing to challenge Madera's qualifications to make that statement because it was not based on scientific studies.

"The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Id.* at 686, 104 S.Ct. at 2064. "This right does not mean errorless or perfect counsel whose

17

competency of representation is to be judged by hindsight." *Robertson v. State*, 187 S.W.3d 475, 483 (Tex. Crim. App. 2006).

Appellant argues that the record "shows a breakdown of professional competence in the area of expert testimony." Specifically, he takes issue with Madera's testimony that Jane's demeanor was consistent with a child who had been abused and was sitting in the courtroom with someone who raped her, while Madera admitted that no studies supported her conclusion. Appellant argues that this testimony runs afoul of cases holding "it is error to allow an expert witness to comment on another witness['s] credibility." In support, he cites five cases: *Yount v. State*, 872 S.W.2d 706, 712 (Tex. Crim. App. 1993) ("We hold that Rule 702 does not permit an expert to give an opinion that the complainant or class of persons to which the complainant belongs is truthful."); *Lane v. State*, 257 S.W.3d 22, 27 (Tex. App.—Houston [14th Dist.] 2008, pet. ref'd) (finding counsel's representation deficient because he failed to preserve complaint for review about one doctor's testimony that "false accusations of childhood sexual assault are very rare" and a counselor's testimony that she had determined that the complainant was telling the truth); *Miller v. State*, 757 S.W.2d 880, 884–85 (Tex. App.—Dallas 1988, pet. ref'd) (reversing for new trial because counsel's assistance was ineffective by failing to object to several witnesses' opinion testimony that child was generally truthful and was telling the truth about being sexually abused, and

18

expert's opinion testimony that expert would be able to tell if child was being untruthful, which was especially harmful in light of lack of physical evidence); *Sessums v. State*, 129 S.W.3d 242, 248 (Tex. App.—Texarkana 2004, pet. ref'd) (reversing for new trial because counsel's assistance was ineffective in failing to object to the "the witnesses [who] were asked to explain and then to comment directly on the factors they used in determining if this child was telling the truth" because appellant was likely harmed by counsel's "error in failing to object to extensive, inadmissible, and critical testimony," given that the only other testimony about appellant came from the victim); *Fuller v. State*, 224 S.W.3d 823, 836 (Tex. App.—Texarkana 2007, no pet.) (reversing for new trial because "the victim's credibility was the only real issue at trial and counsel repeatedly or entirely failed to object to the introduction of testimony on the truthfulness and credibility of the victim's allegations" by numerous witnesses such that counsel's conduct in "allowing the State unfettered and unchecked bolstering of the victim was so outrageous that no competent attorney would have engaged in it").

The State responds that these cases are inapposite. It argues that, [co]ntrary to appellant's assertions, Dr. Madera did not comment on whether the complainant was telling the truth," and the State disputes the suggestion that appellant "would not have been convicted, but for her testimony."

"The two prongs of *Strickland* need not be analyzed in a particular order." *See Ex parte Martinez*, 330 S.W.3d 891, 901 (Tex. Crim. App. 2011). We need not decide if appellant's counsel's performance was deficient because we agree with the State that—examining the record as a whole—appellant has failed to carry his burden to demonstrate prejudice. "The Court of Criminal Appeals has noted that the standard for showing prejudice on a claim of ineffective assistance of counsel is more demanding than the showing needed to prove harm under the Rules of Appellate Procedure." *Thomas v. State*, 445 S.W.3d 201, 210 (Tex. App.—Houston 2013, pet. ref'd) (citing *Martinez*, 330 S.W.3d at 903). "To prevail, appellant must show a reasonable probability that but for his counsel's deficient performance, the result of the proceeding would have been different. *Id.* (citing *Bone*, 77 S.W.3d at 833).

Determination of a witness's credibility and truthfulness lies within the province of the jury. *Yount*, 872 S.W.3d at 710. Although Madera opined that Jane's demeanor was "very consistent with a child that's been sexually abused and traumatized and now faced with sitting in the room with a person who raped her," she acknowledged explicitly that credibility and truthfulness is a matter for the jury, stating that she does not have any basis to know if Jane was sexually abused or not, and agreeing that it is for the "jury to decide."

Here, there was physical evidence of sexual assault introduced into evidence, and Jane gave detailed testimony about appellant's actions. Unlike the witnesses in the cases appellant cites, Madera was clear that she was in fact not opining on whether Jane was telling the truth, and she agreed that Jane's courtroom demeanor could also be consistent with a child that is lying and does not want to face the person she is falsely accusing. The State elicited testimony during Madera's direct examination that she was not opining on whether Jane had been sexually abused and that her opinions about her observations were not based on studies, but only on her experience. Appellant's counsel followed up in cross-examination by eliciting again testimony that Madera was not opining that Jane had been abused, and that Madera has had "encounter[s] where a child was not being truthful."

Given this context, appellant has not demonstrated that had his counsel objected to Madera's testimony or requested a hearing on her qualifications, there is a reasonable probability that the outcome of the case would have been different. *Strickland*, 466 U.S. at 694, 104 S. Ct. at 2068.

We overrule appellant's three ineffective assistance of counsel points of error.

## CONCLUSION

We affirm the trial court's judgment.

21

Sherry Radack
Chief Justice

Panel consists of Chief Justice Radack and Justices Massengale and Brown.

Do not publish. Tᴇх. R. Aᴘᴘ. P. 47.2(b).