**Opinion issued February 21, 2013**



In The

# Court of Appeals

For The

# First District of Texas

—————————————

## NO. 01-11-00631-CR

—————————————

**JOHN PAUL THOMAS, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the County Criminal Court at Law No. 1**
**Harris County, Texas**
**Trial Court Case No. 1711637**

---

## O P I N I O N

A jury convicted appellant John Paul Thomas of the Class A misdemeanor offense of driving while intoxicated. *See* TEX. PENAL CODE ANN. § 49.04 (West Supp. 2012). After finding an enhancement allegation true, the trial court assessed

his punishment of a fine of $750 and one year in county jail, probated for two years of community supervision.  On appeal, Thomas argues that he was denied effective assistance of counsel during the guilt-innocence phase of the trial.  He also contends that the court erred by not filing findings of fact and conclusions of law setting forth the basis for denying his motion for new trial, which also was premised on ineffective assistance of counsel.

We affirm.

## Background

Thomas worked as a manager at an automobile dealership.  After leaving work at approximately 10:30 p.m., Thomas went home, and, because he suffers from a sleep disorder, took a prescription-strength sleeping pill (Ambien) around 11:30 p.m.  After dozing at home, he awoke craving a cigarette.  At approximately 1:00 a.m., he left his house and began driving to a convenience store to purchase cigarettes.  After driving several miles, Thomas stopped at a stoplight.  He closed his eyes to rest and fell asleep.

Around the same time, Houston Police Department Officer E. DeLeon was on patrol.  She spotted Thomas's car stopped at the light.  She watched as the light went through two cycles,  and the car did not move.  She pulled beside the car, and she saw that Thomas's "head was completely down" and he "appeared to be asleep."  She knocked on the window, but Thomas did not respond.  Looking

through the window with a flashlight, DeLeon noticed that Thomas's foot was on the brake, but the car was in drive.  She entered the car through the unlocked passenger-side door, put the gear into park, and removed the keys from the ignition.

When DeLeon entered the car, she immediately noticed the smell of alcohol, and she "assumed [Thomas] was intoxicated at that time."  She also noticed the smell of alcohol "coming from him."  DeLeon helped Thomas out of the car.  She testified that he was "unsteady on his feet," that his "speech was very slurred," and that he had "glassy eyes, very red eyes."  Considering these factors along with the odor of alcohol, DeLeon believed that Thomas was intoxicated.  Although Thomas became more steady as he awoke in the back of the patrol car while awaiting the arrival of the DWI unit, DeLeon believed that he was not in control of his mental and physical faculties that night.

On cross-examination, DeLeon was questioned about the possibility that Thomas had dozed off out of exhaustion rather than intoxication.  DeLeon testified, "He was passed out because of the intoxication."  On redirect examination, she testified that fatigue or "taking something" would not make a person smell strongly of alcohol.  She noted that, although she has been trained to conduct field sobriety tests, she did not conduct the field sobriety testing in this case, instead calling for other officers to do so.

3

Houston Police Department Officer J.R. Roberts, a member of the police department's DWI Task Force, responded to DeLeon's call for assistance. When Roberts encountered Thomas, who had been waiting in DeLeon's patrol car, he noticed that Thomas had "a strong odor of alcoholic beverage on his breath." He also noticed that Thomas's speech was "slightly slurred."

A patrol-car videorecording showing the administration of field sobriety tests was played for the jury. After testifying about his credentials, Roberts testified that there are three "standardized and validated" field sobriety tests: the horizontal gaze nystagmus, the one-leg stand, and the walk-and-turn. He testified that the National Highway Traffic Safety Administration specifies that the presence of two clues on a single test indicates that a person is impaired. Thomas refused to take the horizontal gaze nystagmus test, but he took the other two tests. Roberts testified that Thomas displayed three of four "clues" tending to show intoxication on the one-leg-stand test, including the fact that he dropped his foot. Roberts testified that Thomas displayed four of eight "clues" on the walk-and-turn test, including his failure to maintain heel-to-toe contact. Based on these tests, Roberts made a determination as to Thomas's intoxication, however he administered an additional test, which he said was standardized but not validated, "meaning there really is no pass or fail of the test." He testified:

> It's called the Rhomberg balance test. Basically a person is asked to stand with their feet together and tilt their head back and close their

4

eyes.  They are asked to estimate a passage of 30 seconds.  And when they believe 30 seconds has gone by, bring their head forward and open their eyes and told to stop.

Roberts testified that Thomas estimated the passage of time at 28 seconds, but he had a "distinct 1-to-2-inch circular sway."  Roberts explained why that was significant:

> Everybody when they stand with their feet together and their head tilted back is going to have some sway.  The average person falls at about half of an inch.  Anything considerably more than an inch, you consider it to be a little outside of the normal range.  And a circular sway is almost always abnormal.

He said the Rhomberg test is "just a gauge of something to look at.  But, again, this isn't a pass/fail test."

Roberts testified that Thomas told him that he had taken Ambien.  Based on his training and experience, Roberts testified as to the effect of Ambien alone and in combination with alcohol:

> Q.     Now, does Ambien have any type of effects on the body?
>
> . . . .
>
> A.     Yes, sir, it does.
>
> Q.     What type of effect is that?
>
> A.     Almost the same as any other central nervous system depressant, and it can slow the body down which is what helps people go to sleep.
>
> . . . .

5

Q.  So, tell us, what are the effects of Ambien if combined with alcohol?

A.  It intensifies the effect of the original drug and it causes drowsiness and—the worst part, of course is it intensifies both drugs.  Any time you use two drugs in the same category, it makes each drug stronger.

The State sought to introduce into evidence an image of the label from a prescription pill bottle allegedly found in Thomas's car.  The State intended to show the jury that the sleeping pills carried a warning about the effect of combining them with alcohol.  Thomas's counsel objected based on the lack of foundation, specifically that Roberts did not recall with certainty whether he had created the image.  Defense counsel believed that it was created by Thomas's prior attorney.  The trial court did not admit the image.

However, Roberts did testify that the "drug-label warnings associated with Ambien" state that the drug can impair a person's ability to drive and that combining Ambien with alcohol "intensifies the effect."  Roberts also testified that he could tell the difference between a person who was intoxicated and a person who was fatigued, because a fatigued person would not smell like alcohol, would not have slurred speech, and would not perform poorly on field sobriety tests.

Based on all of his observations, experience, and training, Roberts concluded that Thomas had lost the normal use of his mental and physical faculties "through the introduction of alcohol into his system."  He said "there could have been" other

6

factors contributing to Thomas's loss of the use of his mental and physical faculties, but he said he would have to "base it just off the standardized field sobriety tests and then, obviously, alcohol being something that I can smell. . . . I can take his statement and add that to it, but that's the only way I would be able to know for sure about that." He also testified, "I can tell the difference between somebody who is really tired and somebody who has been drinking." On cross-examination, Roberts testified that he did not administer a breath test, and based on departmental policy he did not pursue a search warrant for a blood test.

Officer R. Montelongo, also a member of HPD's DWI Task Force, testified that Roberts asked him to administer a breath test to Thomas at the police station. After giving the proper warnings, including information about license revocation for failing to provide a sample, Thomas refused the breath test and refused to sign associated paperwork. Montelongo also testified that Thomas "had a strong odor of an alcoholic beverage emitting from his breath and person." On cross-examination, both Roberts and Montelongo testified that alcohol itself is odorless.

Thomas testified, and he denied consuming alcoholic beverages before he left work at approximately 10:30 p.m. or any time after that. On that night, he returned home, took an Ambien, dozed briefly, and when he awoke he left his house to buy cigarettes. He admitted that he stopped at a light, closed his eyes, and

dozed off again. But he denied that he had lost the normal use of his mental or physical faculties at that time.

Thomas said that the passenger's side door was not unlocked as DeLeon had testified, and that it was he, not DeLeon, who put the car in park. He said that when DeLeon roused him, "[s]he was yelling, cursing for me to get out of the car." He testified that he was "scared":

> I was—there was an officer yelling at me to get the "f" out of the car. I wasn't quite sure what was going on.
>
> . . . .
>
> I got out of the car and tried to have a conversation with the officer, and she kept pushing me up against the car. And I tried to turn around once to talk with her; and she said, If you resist, I will f-ing tase you.

Thomas testified that DeLeon pushed him up against his car and handcuffed him. He later testified that DeLeon did not "violently" push him against his car, and he said, "She was asserting her voice, I guess, to make up for the lack in her size."

Thomas testified that he was exhausted at the time the field sobriety tests were conducted. He claimed to have told an officer that he had taken an Ambien. Thomas denied being intoxicated or having lost the normal use of his mental and physical faculties. He then addressed his performance on the field-sobriety tests. As to his refusal of the horizontal gaze nystagmus test, he said, "I didn't have a problem doing the test but the video couldn't see it . . . the video couldn't

8

determine the results of that test." As to the one-leg-stand test, he explained that he put his foot down when Roberts gestured downward because he assumed "that the test was over and he was telling me to put my foot down." As to the walk-and-turn test, Thomas said, "My perception of heel to toe was instead of walking two feet side by side, it was one foot in front of the other." Finally, as to the officers' testimony that they smelled a strong odor of alcohol on him, he said, "I don't think they were lying. I think that's just standard operating procedure. I think that's just what they are instructed to put down on their report."

On cross-examination, the State asked if he had previously provided the information he testified about on his direct examination:

Q. Mr. Thomas, we've never met before, have we?

A. No.

Q. Never talked before?

A. No.

Q. And you've never told me or any other prosecutor in my office this story that you came out with today on the stand about officer—

Thomas's counsel objected on the grounds of relevance, saying, "He has no duty to tell anyone." The trial court sustained the objection. The State again inquired about Thomas's testimony regarding DeLeon's treatment of him:

Q. This is the first time you are saying this?

9

A.      First time I've been asked.

Thomas's counsel spoke first at closing argument.   He argued that deficiencies in the State's proof warranted a conclusion that there was a reasonable doubt that Thomas was intoxicated as opposed to just fatigued.  For example, as to DeLeon's testimony, he argued:

> [I]f my client drove along [the road] that far and if he had passed out and had not dozed off, if he had passed out, he would be significantly impaired and significantly intoxicated.  And yet the position of his car at the time he comes to the light is as the officer said, where he should have been, in the correct lane, at the correct distance from the light.  So, is that more consistent with him being passed out, or is it more consistent with dozing off?  Clearly, with dozing off.  Okay?
>
> . . . .
>
> [M]y client indicated that, yes, I did have a sleeping disorder and, yes, I was taking Ambien.  Yes, I was.  Clearly, could that cause him to be sleeping and to doze off because he has a sleeping disorder?  Absolutely.

He then anticipated what the State would argue in its closing: "I anticipate that the State is going to say that John Paul Thomas is a liar; he's lying, ladies and gentlemen, to get out of this.  We know that he was drinking that night.  We know he was because the officer said it."

The State, in fact, argued that Thomas was lying:

> Please, please, please use your common sense. . . .  You judge the credibility of the officers.  Use your common sense.  Because you know what?  Your common sense leads to one thing.  Fatigue, that don't fly.

10

[Defense counsel] is right, he knows exactly what I'm going to say. It is just another lie. He came up here and gave you guys a great closing, tell you guys what I was going to bring you forward with regards to the State. Common sense tells you, why does he intend to think what I am going to say?

. . . .

I gave you testimony from a credible witness, Officer DeLeon. Apparently that same person who came up here, raised her hand, took an oath and sat down was some raven lunatic that night, trying to use her voice to make up for her small stature. Just another lie, another lie in a trail of lies, a trail of lies that started at [Thomas's home] and ended [where he stopped his car]. . . . It's a trail of lies. Someone has been lying to you. That person sits right there before you.

What did I give you? Not just one credible witness, not just two, I gave you three credible witnesses, people who have no vested interest to lie, to put their reputation and their jobs on the line, to come here and make up . . . lies and perjure themselves just for one person. Come on, common sense tells you the lie starts here and it ends here. The lie is, I was just asleep. The truth is he was intoxicated. The truth is he did take an Ambien at 11:30.

. . . .

I'm sorry, but I don't care how late you stay up. Your body and your breath does not emit an odor [of] an alcoholic beverage. It's a lie.

The jury found Thomas guilty, and the trial court sentenced him to a fine of $750 and one year in county jail, probated for two years of community supervision. Thomas filed a motion for new trial on the grounds that he was denied effective assistance of counsel during the guilt-or-innocence stage of his trial and that the interest of justice required a new trial. Specifically, he made the following allegations of deficient performance:

11

1. Counsel failed to ask for an instruction to disregard testimony, and to move for a mistrial, after the prosecutor improperly cross-examined Thomas with his post-arrest silence;

2. Counsel failed to object after the prosecutor improperly cross-examined Thomas with his post-arrest silence a second time;

3. Counsel failed to object after the prosecutor struck at Thomas over his counsel's shoulders during final argument;

4. Counsel failed to object after the prosecutor improperly injected his personal opinion by vouching for the credibility of one of his witnesses during final argument;

5. Counsel failed to make the correct objection after the prosecutor improperly injected his personal opinion by once again vouching for the credibility of his witnesses during final argument; and

6. Counsel objected to evidence that was beneficial to Thomas's defensive theory and failed to re-offer it in the face of a State's objection to a similar exhibit.

Thomas attached to his motion for new trial an affidavit from trial counsel in which counsel conceded that his actions constituted deficient performance. Trial counsel also averred that these actions were "not the result of any trial strategy." At the hearing on the motion for new trial and after the trial court announced its ruling denying the motion, Thomas's appellate counsel requested that the court file findings of fact and conclusions of law and offered to "prepare some but only to assist the Court of Appeals in determining, for instance, whether or not you found the affidavit credible or whether or not you found deficient conduct and no

12

prejudice or anything like that." The trial court noted his request, and said, "If I do them, I will do my own."

The court did not file findings of fact and conclusions of law. On appeal, Thomas challenges the court's refusal to do so, and he argues that he was denied effective assistance of counsel at trial.

## Analysis

## I. Ineffective assistance of counsel

In his first issue, Thomas argues that he was denied effective assistance of counsel at trial. The standard of review for ineffective assistance of counsel is set forth in *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052 (1984), and *Bone v. State*, 77 S.W.3d 828 (Tex. Crim. App. 2002). To prevail, Thomas must first show that his counsel's performance was deficient. *Strickland*, 466 U.S. at 687, 104 S. Ct. at 2064; *Bone*, 77 S.W.3d at 833. "Specifically, [an] appellant must prove, by a preponderance of the evidence, that his counsel's representation fell below the objective standard of professional norms." *Bone*, 77 S.W.3d at 833. "Second, [an] appellant must show that this deficient performance prejudiced his defense," meaning that Thomas "must show a reasonable probability that, but for his counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* (quoting *Mitchell v. State*, 68 S.W.3d 640, 642 (Tex. Crim. App. 2002)). A "reasonable probability" is one "sufficient to undermine confidence in

13

the outcome." *Id.* "It is not sufficient for [an appellant] to show 'that the errors had some conceivable effect on the outcome of the proceeding.'" *Ex parte Martinez*, 330 S.W.3d 891, 901 (Tex. Crim. App. 2011) (quoting *Strickland*, 466 U.S. at 693, 104 S. Ct. 2052), *cert. denied*, 131 S. Ct. 3073 (2011). Rather, [an appellant] must show that 'there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt.'" *Id.* (quoting *Strickland*, 466 U.S. at 695, 104 S. Ct. 2052). Thus, the "benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland*, 466 U.S. at 686, 104 S. Ct. at 2064.

There is a strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance, and the defendant must overcome the presumption that the challenged action might be considered sound trial strategy. *Strickland*, 466 U.S. at 689, 104 S. Ct. at 2065. To overcome the presumption of reasonable professional assistance, "any allegation of ineffectiveness must be firmly founded in the record, and the record must affirmatively demonstrate the alleged ineffectiveness." *Thompson v. State*, 9 S.W.3d 808, 814 (Tex. Crim. App. 1999). "Direct appeal is usually an inadequate vehicle for raising such a claim because the record is generally undeveloped." *Goodspeed v. State*, 187 S.W.3d 390, 392 (Tex. Crim. App. 2005). When determining the validity of an ineffective-

assistance-of-counsel claim, judicial review must be highly deferential to trial counsel and avoid the deleterious effects of hindsight. *Ingham v. State*, 679 S.W.2d 503, 509 (Tex. Crim. App. 1984).

## A. Post-arrest silence

Thomas's first two allegations of ineffectiveness pertain to the State's inquiry about his post-arrest silence. He contends that his counsel failed to ask for an instruction to disregard, and counsel also failed to move for a mistrial after the prosecutor improperly cross-examined Thomas with his post-arrest silence. Thomas also argues that his counsel failed to object after the prosecutor improperly cross-examined him with his post-arrest silence a second time.

Both of these complaints on appeal involve the prosecutor's inquiry about whether Thomas had told anyone about Officer DeLeon's alleged mistreatment of him on the night he was arrested. The first time, the trial court sustained Thomas's objection when the prosecutor began a question, "And you've never told me or any other prosecutor in my office this story that you came out with today on the stand about officer—." In the second instance, the prosecutor asked, "This is the first time you are saying this?" Defense counsel did not object, and Thomas testified, "First time I've been asked."

Thomas argues that both his counsel's failure to move for a mistrial when his first objection was sustained and his failure to object to the second question are

15

errors amounting to ineffective assistance of counsel. As to the second question, even if an objection had been made and sustained, trial counsel would have had to move for a mistrial to preserve error. Thus, we consider both of his arguments together. "The failure of appellant's counsel to request a mistrial could only be termed an act of ineffective assistance of counsel if a mistrial should have been granted." *Weinn v. State*, 281 S.W.3d 633, 641 (Tex. App.—Amarillo 2009), *aff'd on other grounds*, 326 S.W.3d 189 (Tex. Crim. App. 2010). A trial court's ruling on a motion for mistrial is reviewed for abuse of discretion and is upheld if it is within the zone of reasonable disagreement. *Ocon v. State*, 284 S.W.3d 880, 884 (Tex. Crim. App. 2009). "A mistrial is an appropriate remedy in 'extreme circumstances' for a narrow class of highly prejudicial and incurable errors." *Id.* "A mistrial halts trial proceedings when error is so prejudicial that expenditure of further time and expense would be wasteful and futile." *Id.* A mistrial should be granted only when less drastic alternatives fail to cure the prejudice. *Id.* at 884–85.

The two prongs of *Strickland* need not be analyzed in a particular order, *see Ex parte Martinez*, 330 S.W.3d at 901, and we turn first to the prejudice prong. The Court of Criminal Appeals has noted that the standard for showing prejudice on a claim of ineffective assistance of counsel is more demanding than the showing needed to prove harm under the Rules of Appellate Procedure. *Id.* at 903. To prevail, Thomas must show a reasonable probability that but for his counsel's

16

deficient performance, the result of the proceeding would have been different. *Bone*, 77 S.W.3d at 833.

Thomas has not met this burden with respect to the questions about the timing of his allegations of mistreatment at the hands of Officer DeLeon. The defensive theory at trial was that Thomas was not intoxicated, but instead he was exhausted from working long hours, suffering from a sleep disorder, and, possibly, the use of a prescription sleep aid. His testimony that DeLeon yelled at him and threatened to "tase" him if he failed to cooperate was not directly inculpatory or exculpatory in the context of this defense. In some circumstances, the use of a defendant's post-arrest silence can be "akin to a comment on his failure to testify at trial because it attempts to raise an inference of guilt arising from the invocation of a constitutional right." *Wyborny v. State*, 209 S.W.3d 285, 291 (Tex. App.—Houston [1st Dist.] 2006, pet. ref'd) (citing *Dinkins v. State*, 894 S.W.2d 330, 356 (Tex. Crim. App. 1995)). But in this context, the prosecutor's questions about Thomas's failure to complain previously about DeLeon's treatment of him did not raise an inference of guilt on the DWI charge. Thomas has not shown that these questions resulted in incurable prejudice such as would have justified a mistrial. *See Ocon*, 284 S.W.3d at 884–85. He therefore has not shown a reasonable probability that but for his counsel's allegedly deficient performance, the result of his trial would have been different. *See Bone*, 77 S.W.3d at 833.

17

**B. Vouching for the credibility of the witnesses**

Thomas brings two allegations of ineffectiveness based on his counsel's failure to object to the prosecutor's comments in closing argument about the credibility of the State's witnesses. He contends that he was prejudiced by his counsel's failure to object, or counsel's failure to make the correct objection, after the prosecutor improperly injected his personal opinion by vouching for the credibility of a witness during final argument. Thomas argues that these comments are so prejudicial that they warrant reversal without a showing of harm.

As we have explained, an appellant must satisfy both the deficient performance and prejudice prongs of the *Strickland* standard to prevail on an ineffective assistance of counsel claim on appeal. *Rylander v. State*, 101 S.W.3d 107, 110 (Tex. Crim. App. 2003). The approved areas of jury argument are (1) summation of the evidence, (2) reasonable deduction from the evidence, (3) answer to the argument of opposing counsel, and (4) plea for law enforcement. *Wesbrook v. State*, 29 S.W.3d 103, 115 (Tex. Crim. App. 2000). Ordinarily it is improper for a prosecutor to vouch for the credibility of a witness during his argument. *See Menefee v. State*, 614 S.W.2d 167, 168 (Tex. Crim. App. 1981); *Chapman v. State*, 503 S.W.2d 237, 238 (Tex. Crim. App. 1974). But a prosecutor may argue his opinion concerning a witness's credibility or the truth of witness's testimony if the opinion is based on reasonable deductions from the evidence and

does not constitute unsworn testimony. *McKay v. State*, 707 S.W.2d 23, 37 (Tex. Crim. App. 1985); *Gonzalez v. State*, 337 S.W.3d 473, 483 (Tex. App.—Houston [1st Dist.] 2011, pet. ref'd). In addition, a prosecutor may argue about the credibility of a witness if such argument was invited by and is responsive to appellant's arguments. *Chapman*, 503 S.W.2d at 238; *McDuffie v. State*, 854 S.W.2d 195, 216–17 (Tex. App.—Beaumont 1993, pet. ref'd). Wide latitude is allowed without limitation in drawing inferences from the evidence, so long as the inferences drawn are reasonable, fair, legitimate, and offered in good faith. *Gaddis v. State*, 753 S.W.2d 396, 398 (Tex. Crim. App. 1988).

The State waived its right to speak first at closing argument, reserving its right to close. Thus, Thomas's counsel spoke first. In his closing argument, Thomas's counsel questioned the credibility of the police officers who testified at trial and anticipated that the State would accuse Thomas of lying. He argued:

> I anticipate that the State is going to say that John Paul Thomas is a liar; he's lying, ladies and gentlemen, to get out of this. We know that he was drinking that night. We know he was because the officer said it. Well, they don't remember what the beverage was, but they are going to say that.
>
> . . . .
>
> Third, what else are they going to say? . . . The officers would have no reason to lie. They are just doing their job, right? They are just following their policy. Correct? Officer Roberts said he found— initially he said he found that bottle in the car. Then on cross-examination, said, Well, I don't remember. I don't know. Either he forgot and made it up. I don't know. Officer DeLeon said, He was so

intoxicated that he had to lean against me. And yet ten minutes later he can do those field—he can stand on one leg and do those field sobriety tests ten minutes later. Is it possible everybody is trying to fib a little bit? It's possible. But that's not what you have to decide. What you have to decide is whether or not they've proved their case.

In closing argument, the State made the following statements, as to which Thomas contends his counsel should have objected.

State:              I gave you testimony from a credible witness.

                    . . . .

                    What did I give you? Not just one credible witness, not just two, I gave you three credible witnesses, people who have no vested interest to lie, to put their reputation and their jobs on the line, to come here and make up—

Defense Counsel:  Objection, Your Honor. There is no evidence that their job was on the line.

Trial Court:       Overruled.

Defense Counsel:  Thank you.

State:              —to come here and make up lies and perjure themselves just for one person. Come on, common sense tells you the lie starts here and it ends here.

The State's argument that the witnesses were credible responded to Thomas's counsel's argument that it was possible that everybody was trying to "fib a little bit." The argument that the officers lacked a motivation to lie responded to defense counsel's arguments anticipating the State would say the officers were just doing their jobs and questioning the validity of that premise ("Either he lied and

20

made it up. I don't know."). The State's arguments were reasonable deductions from the evidence and answers to the argument of opposing counsel. *See Wesbrook*, 29 S.W.3d at 115. Because the State's argument about the credibility of the officers was invited by and is responsive to Thomas's arguments, it was not improper. *See Chapman*, 503 S.W.2d at 238; *McDuffie*, 854 S.W.2d at 216–17. "[T]he failure to object to argument that is not improper does not constitute ineffective assistance of counsel." *Davis v. State*, 830 S.W.2d 762, 766 (Tex. App.—Houston [1st Dist.] 1992, pet. ref'd).

## C. Improper argument

Thomas makes another allegation of ineffectiveness based on his counsel's failure to object to the State's closing argument. In particular, Thomas alleges that his counsel was ineffective for failing to object when the prosecutor "struck at [him] over his counsel's shoulders during final argument." The statement to which Thomas argues his counsel should have objected in this regard was: "[Defense counsel] is right, he knows exactly what I'm going to say. It is just another lie. He came up here and gave you guys a great closing, tell you what I was going to bring you forward with regards to the State." Thomas argues that the prosecutor's statement was an effort to characterize his counsel's closing argument as just another lie.

21

To determine whether a party's jury argument properly falls within one of the four proper areas of jury argument, we must consider the argument in light of the record. *Magana v. State*, 177 S.W.3d 670, 674 (Tex. App.—Houston [1st Dist.] 2005, no pet.); *see Wesbrook*, 29 S.W.3d at 115. The State may not use closing argument to "strike" at a defendant over the shoulders of his counsel or accuse counsel of bad faith. *Magana*, 177 S.W.3d at 674; *see also Mosley v. State*, 983 S.W.2d 249, 258–59 (Tex. Crim. App. 1998). A prosecutor runs the risk of improperly "striking" at a defendant over the shoulders of counsel when the argument is made in terms of defense counsel personally and when the argument explicitly impugns defense counsel's character. *Mosley*, 983 S.W.2d at 259; *Magana*, 177 S.W.3d at 674–75. It is, however, permissible for a prosecutor to attack the defense's argument. *See Brown v. State*, 270 S.W.3d 564, 572 (Tex. Crim. App. 2008); *Magana*, 177 S.W.3d at 675. If defense counsel invites argument, it is appropriate for the State to respond. *See Swarb v. State*, 125 S.W.3d 672, 686 (Tex. App.—Houston [1st Dist.] 2003, pet. dism'd).

We have already noted that defense counsel presented an argument that expressly anticipated that the State would accuse Thomas of lying. Considering the prosecutor's argument in light of the record, we conclude that the argument Thomas now finds objectionable was responsive to the argument of defense counsel. As such, these statements were not improper jury argument. "[T]he

22

failure to object to argument that is not improper does not constitute ineffective assistance of counsel." *Davis*, 830 S.W.2d at 766.

### D. Evidentiary errors

Finally, Thomas argues that his counsel was ineffective for objecting to the evidence that was beneficial to his defensive theory and failing to re-offer it later in the trial when the State objected to the introduction of a similar exhibit. During its case-in-chief, the State sought to introduce a copy of the label from the bottle of prescription sleeping pills found in Thomas's car. Thomas objected based on a lack of foundation for the evidence, and the trial court excluded it. Officer Roberts then testified that he was familiar with warning labels used on Ambien, and he testified, without objection, that the warnings state that combining Ambien with alcohol intensifies its effect.

Though both parties on appeal argue that Thomas's defensive theory was that he was exhausted because he took Ambien, the record shows that Thomas attempted to show that Ambien did not work for him and that if he was fatigued it was due to his long hours and sleep disorder. To that end, his counsel attempted to introduce copies of a label from a pill bottle for a different prescription sleep aid, dated March 31, 2011, approximately five months after the date of the offense. In a hearing outside the presence of the jury, defense counsel argued that his proffered exhibits were relevant to the date of the offense: "Basically that would

indicate that the medication was changed. He was on medication and that's clear. So, now we are just indicating that the medication that he was on changed because of the medication that he was receiving was [i]nsufficient." The trial court excluded the exhibits.

On appeal, Thomas argues that his counsel's performance in not seeking admission of the label from the pill bottle found in his car when he was arrested was deficient because the evidence was consistent with his defensive theory. In his brief, he argues:

> The importance of jurors knowing that Appellant had a legitimate prescription from a physician for Ambien on the night he was arrested cannot be overstated. But this record reveals that jurors never heard an iota of testimony on this critical fact, aside from Appellant's unsubstantiated assertion, because counsel's inexplicable objection to [the State's exhibit] kept it out. Counsel's failure to recognize that the admission of this exhibit advanced his defensive theory was objectively deficient.

> . . . .

> Absent any corroborating evidence that Appellant had a lawful prescription for Ambien, jurors could only have opined that his defensive theory lacked credibility.

Thomas's use of Ambien was not contested at trial. In its closing argument, the State said, "The truth is he did take an Ambien at 11:30." The question for the jury was whether his use of his car that night was lawful, not whether his use of the Ambien was lawful. There was no evidence introduced at trial that Thomas's possession and use of the Ambien was anything other than lawful. Thomas has not

24

demonstrated a reasonable probability that but for his counsel's allegedly deficient performance, the result of the proceeding would have been different. *See Bone*, 77 S.W.3d at 833.

### E. Cumulative effect of all alleged errors

In his brief, Thomas argues that he was prejudiced by "his trial counsel's multiplicity of deficient conduct" and "myriad errors." First, we have explained why defense counsel's failure to object to the prosecutor's closing argument was not deficient. Second, we have explained that defense counsel's failure to object and seek a mistrial when the State asked Thomas about his post-arrest silence was not prejudicial because his post-arrest silence about contextual facts was neither incriminatory nor exculpatory. Third, we have explained that defense counsel's failure to pursue introduction of cumulative evidence on a question of fact that was undisputed at trial likewise was not prejudicial. Finally, having considered the appellate record, we conclude that defense counsel's conduct as a whole did not undermine the proper functioning of the adversarial process such that the trial cannot be relied upon as having produced a just result. *See Strickland*, 466 U.S. at 686, 104 S. Ct. at 2064. We overrule this issue.

## II. Effect of failure to issue requested fact findings

In his second issue, Thomas argues that the trial court erred by not filing findings of fact and conclusions of law explaining the basis for its denial of his

motion for new trial. Although Thomas points to no circumstances to suggest the trial judge acted in bad faith or deliberately violated some rule of procedure, he nevertheless contends that "the only conceivable reason" for the trial court's failure to issue written findings and conclusions was a "conscious desire to irreparably hamstring the losing party's ability to seek meaningful review of its adverse ruling."

Thomas relies on Texas Rule of Appellate Procedure 21.8(b), which applies to motions for new trial in criminal cases and states, in relevant part: "In ruling on a motion for new trial, the court may make oral or written findings of fact." TEX. R. APP. P. 21.8(b). By use of the word "may," the rule authorizes—but does not require—a trial court "in ruling on a motion for new trial" of a criminal action to "make oral or written findings of fact." *Id.* Contrary to Thomas's argument that written findings and conclusions are or should be required, the rule anticipates precisely the opposite, as a motion for new trial is deemed denied if not ruled upon in writing within 75 days. *See* TEX. R. APP. P. 21.8(c). As a matter of interpreting the rule as it is presently written, it would not make sense to allow a motion to be implicitly denied for lack of a timely written ruling, yet simultaneously require that any denial be accompanied by written findings of fact and conclusions of law.

Thomas argues for an extension of *State v. Cullen*, 195 S.W.3d 696 (Tex. Crim. App. 2006), to cover the circumstances of this case. In *Cullen*, the Court of

26

Criminal Appeals held that when the losing party on a motion to suppress evidence requests findings of fact and conclusions of law, the trial court is required to file them. The defendant in that case had moved to suppress evidence, and the trial court held a hearing at which the only evidence was the live testimony of the investigating law enforcement officers. *Cullen*, 195 S.W.3d at 696. The trial court granted the motion to suppress and declined the State's request for findings of fact. *Id.* On appeal, the State argued that the trial court's failure to file findings of fact and conclusions of law deprived it of its statutorily granted right of appeal because "without such findings, appellate courts are unable to review the decision for an abuse of discretion." *Id.* at 697. The Court of Criminal Appeals reasoned that the trial court's failure to file findings of fact and conclusions of law prevented the proper presentation of the case to the court of appeals, *see* TEX. R. APP. P. 44.4, and caused the appellate courts to rely on "assumptions that may be entirely fictitious." *Cullen*, 195 S.W.3d at 698. The Court further held:

> Effective from the date of this opinion, the requirement is: upon the request of the losing party on a motion to suppress evidence, the trial court shall state its essential findings. By "essential findings," we mean that the trial court must make findings of fact and conclusions of law adequate to provide an appellate court with a basis upon which to review the trial court's application of the law to the facts.

*Id.* at 699.

Thomas urges us to extend the holding of *Cullen*, imposing a bright-line rule that findings of fact and conclusions of law must be filed by the trial court upon

27

request after the denial of a motion for new trial. The promulgation of new rules of appellate procedure is outside the purview of the authority of a court of appeals. In any case, while *Cullen* did prospectively announce a new rule requiring the issuance of fact findings in certain circumstances, the basis of the judgment reversing the court of appeals in that case was appellate rule 44.4 and its requirement that a trial court be given the opportunity to correct its "erroneous action or failure or refusal to act" which "prevents the proper presentation of a case to the court of appeals." TEX. R. APP. P. 44.4(a)(1).

The issues presented in this appeal do not warrant an abatement pursuant to Rule 44.4. Thomas's motion for new trial was premised on ineffective assistance of counsel, and it raised the allegations of ineffectiveness discussed above. No live testimony was taken at the hearing on the motion for new trial. All of Thomas's allegations of deficient performance pertain to actions or omissions which occurred during trial, all of which are apparent from the face of the record. There is no factual dispute about the actions and omissions at issue. Thus, unlike the circumstance presented in *Cullen*, we need not rely—and indeed have not relied—on any assumptions or implied findings of fact in addressing the merits of Thomas's claims. The motion for new trial was supported by an affidavit from Thomas's trial counsel, providing evidence that his actions and omissions were not part of a trial strategy. But a determination of ineffectiveness is a mixed question

of law and fact, and in this case the trial court's ruling on the motion for new trial depended upon its application of law to the facts that appear in the appellate record and form the basis for Thomas's allegations of ineffectiveness. *See Strickland*, 466 U.S. at 698, 104 S. Ct. at 2070 (explaining that "both the performance and prejudice components of the ineffectiveness inquiry are mixed questions of law and fact"); *Riley v. State*, 378 S.W.3d 453, 458 (Tex. Crim. App. 2012) (same). Our analysis does not assume that the trial court discounted the veracity of trial counsel, nor would it change depending on any particular fact finding the trial court may have made in that regard.

Because there is no rule requiring a trial court to file findings of fact and conclusions of law after denying a motion for new trial, and because the factual basis for the allegations of ineffectiveness is apparent on the face of the appellate record in this case without any assumptions about factual findings the trial court may or may not have made, we decline to abate this case pursuant to Rule 44.4. We overrule Thomas's second issue.

**Conclusion**

We affirm the judgment of the trial court.

Michael Massengale
Justice

Panel consists of Justices Keyes, Massengale, and Brown.

Publish.   TEX. R. APP. P. 47.2(b).