**MODIFY and AFFIRM; and Opinion Filed October 31, 2013.**



In The

# Court of Appeals
## Fifth District of Texas at Dallas

### No. 05-12-00837-CR

**MICHAEL WAYNE LEWIS, Appellant**
**V.**
**THE STATE OF TEXAS, Appellee**

**On Appeal from the Criminal District Court No. 6**
**Dallas County, Texas**
**Trial Court Cause No. F11-50889-X**

## OPINION

Before Justices Bridges, Fillmore, and Lewis
Opinion by Justice Fillmore

A jury convicted Michael Wayne Lewis of robbery and assessed punishment of life imprisonment. In five points of error, Lewis asserts (1) the evidence is insufficient to support his robbery conviction because it does not establish beyond a reasonable doubt that he had the intent to obtain or maintain control of the complainant's property, (2) he was egregiously harmed by the trial court's failure to include a jury charge instruction on the affirmative defense of involuntary intoxication, (3) he received ineffective assistance of counsel at trial by his counsel's failure to request a jury charge instruction on the affirmative defense of involuntary intoxication, (4) there is insufficient evidence to support the trial court's order requiring him to pay $264 in court costs, and (5) the judgment should be reformed to reflect the statute he was found to have violated. We modify and affirm the trial court's judgment.

## Background

Lewis was charged with the felony offense of robbery. *See* TEX. PENAL CODE ANN. § 29.02 (West 2011). He pleaded not guilty to the charge. He pleaded true to the enhancement paragraphs contained in the indictment. The jury found Lewis guilty of robbery and that the enhancement allegations are true. The jury assessed punishment of life imprisonment. The trial court also ordered Lewis to pay $264 in court costs.

## Sufficiency of the Evidence

In his first point of error, Lewis asserts the evidence is insufficient to support his robbery conviction because it does not establish beyond a reasonable doubt that he had the intent to obtain or maintain control of the complainant's property. The State responds that the evidence is sufficient to show Lewis possessed the intent to obtain or maintain control of the complainant's property. *See* TEX. PENAL CODE ANN. § 29.02(a).

### *Standard of Review and Applicable Law*

We review the sufficiency of the evidence under the standard set out in *Jackson v. Virginia*, 443 U.S. 307 (1979). *Adames v. State*, 353 S.W.3d 854, 859 (Tex. Crim. App. 2011), *cert. denied*, 132 S. Ct. 1763 (2012). We examine all the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson*, 443 U.S. at 319; *Adames*, 353 S.W.3d at 860. This standard recognizes "the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weight the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson*, 443 U.S. at 319; *see also Adames*, 353 S.W.3d at 860. The jury, as the fact finder, is entitled to judge the credibility of the witnesses, and can choose to believe all, some, or none of the testimony presented by the parties. *Chambers v. State*, 805 S.W.2d 459, 461 (Tex. Crim. App. 1991). We defer to the jury's determinations of witness

credibility, and may not substitute our judgment for that of the fact finder. *Brooks v. State*, 323 S.W.3d 893, 899 (Tex. Crim. App. 2010) (plurality op.); *King v. State*, 29 S.W.3d 556, 562 (Tex. Crim. App. 2000) (in conducting legal sufficiency analysis, appellate court "may not re-weigh the evidence and substitute our judgment for that of the jury").

Lewis was charged with intentionally and knowingly causing bodily injury to the complainant, Shanita Taylor, in the course of committing theft of property and with the intent to obtain or maintain control of the property. *See* TEX. PENAL CODE ANN. § 29.02(a)(1) (a person commits an offense of robbery if, in the course of committing theft and with the intent to obtain or maintain control of the property, he intentionally, knowingly, or recklessly causes bodily injury to another). Therefore, we review the evidence in the light most favorable to the jury's verdict of guilt to determine whether a rational trier of fact could have found beyond a reasonable doubt that Lewis assaulted Taylor with the intent to obtain or maintain control of the her property.

Intent may be inferred from circumstantial evidence such as acts, words, and the conduct of the accused. *Guevara v. State*, 152 S.W.3d 45, 50 (Tex. Crim. App. 2004); *see also Robles v. State*, 664 S.W.2d 91, 94 (Tex. Crim. App. 1984) (intent with which appellant entered habitation is fact question for jury to decide from surrounding circumstances). If the record supports conflicting inferences, we must presume that the fact finder resolved the conflicts in favor of the prosecution and therefore defer to that determination. *Jackson*, 443 U.S. at 326. Further, "[c]ircumstantial evidence is as probative as direct evidence in establishing the guilt of an actor, and circumstantial evidence alone can be sufficient to establish guilt." *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007).

Taylor testified at trial. At about 11:45 p.m. on January 5, 2011, she had just locked the front door of Arby's restaurant on Garland Road, Dallas, Texas, where she was employed as the assistant manager. She saw a man wearing a gray hooded jacket crossing Garland Road and running toward her in Arby's parking lot. He said, "Excuse me, ma'am" as he rapidly approached her. She dropped or tossed her purse and phone a few feet from where she was standing and told the man to "just take it." The man did not go toward the purse and phone at that time. He was hitting her back and attempting to push or pull her to the ground. He eventually pulled her to the ground by her hair. He continued hitting her after forcing her to the ground. The man grabbed her by the legs and began dragging her to the side and toward the back of Arby's. She recalled screaming, and he told her more than once to "shut up." The man kicked her in the face. An automobile headlight shone in the parking lot, and the man began to run away. He grabbed Taylor's purse and ran across Garland Road. She saw the man the police arrested after this incident in a police car, and she has no doubt it was the man who attacked her. Taylor's purse was returned to her by the police. Taylor was so afraid during the attack that she urinated on herself. She had marks on her back from being dragged and marks on her neck from being struck. She sought medical attention the following morning. She had to have her dental braces realigned as a result of being kicked in the face.

Taylor prepared a sworn, written statement for the police while at the northeast substation shortly after the incident. Taylor's statement contains the following:

> On 01/05/2011 at about 11:35 p.m. I was walking from the Arbys parking lot. As I was walking I seen a man in a grey hoody walk across the sidewalk and then back. As he was walking back he looked at me and said excuse me ma'am. As he began to speak he immediately started to rush me. He began pushing me and telling me to shut up. As he was pushing I pushed back & fell to the floor. He then began to drag me by my legs to the back of Arbys. As he was dragging me I was yelling kicking & screaming. He continued to tell me to shut up. I finally turned on my stomach and tried to kick & get off of the ground. As I was laying

on my stomach he ran & grabbed my purse. He then took off running again & dropped my purse. I looked up & he was running across the street.

Officer Chad Mraz of the Dallas Police Department testified that on January 5, 2011, he was driving an unmarked vehicle and was dressed in plain clothes. He was traveling on Garland Road and saw Taylor locking the front door of Arby's and walking away from the door. As he was driving by Taylor, he saw Lewis crossing Garland Road at a rapid pace toward Taylor. Mraz made a u-turn and drove in front of Arby's on Garland Road traveling in the opposite direction. Mraz radioed for assistance by uniformed police in marked squad cars. Lewis had Taylor on the ground in the parking lot. Taylor was yelling and screaming. Lewis was trying to drag Taylor on her back by her foot or arm around the side of the building. Mraz did not see Lewis hit Taylor or pull Taylor's hair, although after the incident, Taylor told Mraz that Lewis had kicked and punched her and had pulled her hair. Lewis noticed the headlights from Mraz's vehicle. Lewis released Taylor, grabbed her purse, and ran across Garland Road. Lewis dropped Taylor's purse in or near Garland Road while running across the thoroughfare. Mraz followed Lewis and pulled his vehicle behind Lewis. Sergeant Eric Larson of the Dallas Police Department drove the squad car he was in to the location of Lewis and arrived at the same time as Mraz. Lewis told Mraz the man the police were looking for "ran that way" or "there he goes, the person you were looking for" and pointed to his left. Mraz had not taken his eyes off of Lewis. Larson took Lewis into custody and placed him in the squad car. Mraz went to check on Taylor and returned her purse to her. Mraz identified Lewis in the courtroom.

Larson testified he was on duty, driving a marked Dallas Police Department vehicle, and wearing a police uniform on January 5, 2011. At approximately 11:45 p.m., he heard Mraz on the radio indicating he believed a robbery was in progress at Arby's on Garland Road. He drove the short distance to the location on Garland Road and saw a man crossing Garland Road at the Arby's location. Larson does not remember seeing anything in Lewis's hands. Larson heard

Mraz say on the radio that the man crossing Garland Road was the suspect. Larson pulled his squad car into the parking lot across Garland Road from Arby's and told Lewis to stop and place his hands on the squad car. Lewis pointed and said "the guy ran that way." Larson placed Lewis in handcuffs and Lewis was taken into custody. After placing Lewis in the squad car, Larson drove the squad car across Garland Road to Arby's parking lot. Other police officers began arriving at the scene. Some of the officers began interviewing Taylor. A female officer transported Taylor to the Dallas Police Department northeast substation to be interviewed. Lewis was transported to the same northeast substation in another squad car. Larson identified Lewis in the courtroom.

Detective Richard Manuel of the Dallas Police Department crime scene division went to the Arby's parking lot shortly after the incident to gather and photograph evidence. Manuel testified that none of the police officers saw any evidence that Lewis had a weapon of any kind. Manuel did not see any hair or a phone at the scene. The clothing Taylor was wearing at the time of the incident was not inspected or tested by Manuel, although he acknowledged it could have evidenced Taylor was dragged in the parking lot.

Dallas Police Department officer Andrea Cotty testified she transported Taylor from Arby's to Taylor's apartment so Taylor could change her clothing before Cotty transported her to the northeast substation. Taylor was extremely upset and crying, and she was embarrassed because she had urinated on herself during the incident.

Detective Allen Holmes of the Dallas Police Department interviewed Taylor at the northeast substation. Holmes testified he did not believe it was necessary to retrieve the clothing Taylor wore at the time of the incident, because on-duty police officers witnessed the offense, never lost sight of Lewis, and placed Lewis in custody. Holmes believes Taylor told him Lewis shoved and pushed her, that there was a struggle, and Lewis took her purse. Taylor did not tell

Holmes that Lewis grabbed her purse from her hands. Holmes does not believe Taylor told him Lewis punched her, pulled her hair, or kicked her in the face. The statement Taylor wrote shortly after the incident does not say Lewis beat, hit, pulled, or kicked her. At the scene of the incident, Taylor refused medical attention. Taylor told Holmes her shoulder was hurting and that she would seek medical treatment. Holmes did not see marks on Lewis when he was brought to the northeast substation before being transported to jail.

Lewis testified during the guilt phase of trial. Lewis testified he has a drug problem, and his "drug of choice" is crack cocaine. He testified he had been smoking crack cocaine since 1992 anytime he "had the money." After leaving work on January 5, 2011, he went to a liquor store and bought a "fifth of MD 20/20, a 40 ounce, two Earthquakes, and a pint of gin." He then went to a vacant apartment at the Easton Apartments, across Garland Road from Arby's, to purchase and smoke crack cocaine. He arrived at the crack house at 6:00 or 7:00 p.m. As he recalls, he spent $110 on "rocks of crack," and he smoked six or seven rocks of crack cocaine at the apartment, although at one point Lewis testified he had smoked twelve rocks of crack cocaine that night. According to Lewis, after smoking the rocks of crack cocaine and consuming alcohol, he was "so high." He asked the drug dealer at the apartment for a cigarette, which he smoked. Before that evening, he had only smoked crack cocaine with the people at the crack house and had not smoked marijuana or cigarettes there.

According to Lewis, he left the apartment at approximately 11:30 p.m. While waiting at a location on Garland Road for a bus, he began to hallucinate, hearing voices and seeing faces of dead relatives in his head. Although he had smoked crack cocaine since 1992, he had never heard voices or hallucinated like that before. He believed the cigarette he smoked was "laced" with some type of drug. The hallucinations frightened him, and he started walking down Garland Road. He heard a door open and the sound of keys jingling. He saw Taylor coming out

–7–

of Arby's.  It "came to his mind" that she would help him with what he was experiencing.  He crossed Garland Road walking quickly, although he testified he did not "rush" Taylor.  By the time he crossed Garland Road, Taylor had locked the door.  He said, "Excuse me, ma'am."  She tried to give Lewis her purse, but he told her he did not want her purse.  Taylor then threw her purse down.  Lewis saw a car coming and "freaked out."  He grabbed Taylor's hand because he was shaking.  He did not release her hand, because she would have fallen backward if he had released her and would have injured herself.  Taylor was panicked and hysterical.  Lewis stated he did not hit or kick Taylor, and he did not pull her hair.  Lewis ran to a parking lot across Garland Road.  He stopped of his own accord.  Mraz was the first officer who came in contact with Lewis, and Lewis told him "they after me, man, help me, please, man."  Mraz had Lewis lay on the hood of his vehicle, and Mraz handcuffed him.  Larson also arrived by vehicle.

Lewis testified he put his hands on Taylor, but he did not throw her down or slap, beat, or kick her.  He did not intend to take Taylor's purse or telephone.  He did not fight with Taylor or cause Taylor any bodily injury.  According to Lewis, he did not rob Taylor, and he did not grab her purse and run away with it, and Mraz lied when he said he saw Lewis running with Taylor's purse.

Lewis also testified regarding his prior arrests and convictions.  From the period 1991 to 2008, he was incarcerated for all but a two and one-half year period.  Lewis testified that in the past, he had taken purses, threatened to hurt people, and had hurt people.  When asked if he was familiar with the elements of robbery and aggravated robbery, Lewis testified, "Been there, done that, sir."  In 1981, Lewis pleaded guilty to attempted burglary of a building and burglary of a building.  Also in 1981, he pleaded guilty to theft of a purse.  In 1988, he was convicted of burglary of a building.  In 1991 and 1992, Lewis was convicted of two robberies; despite testifying that he does not strike women, he struck the female victims of both robberies.  He

testified that he had been arrested for robbery in circumstances similar to the circumstances of this case. Lewis testified that when he previously took purses from women, he had a drug problem. He acknowledged that he had a drug problem in 2011.

*Analysis*

Examining all the evidence in the light most favorable to the verdict, we must determine whether the jury as fact finder could rationally find beyond a reasonable doubt that Lewis assaulted Taylor with the intent to obtain or maintain control over Taylor's property. *See Jackson*, 443 U.S. at 319; *Adames*, 353 S.W.3d at 860. Taylor testified that after Lewis approached Taylor, she dropped or tossed her purse and phone a few feet from where she was standing. Lewis did not go toward the purse and phone at that time, however Lewis grabbed her by the legs and began dragging her to the side and toward the back of the Arby's building. An automobile headlight shone in the parking lot, and Lewis began to run away. Taylor testified that Lewis grabbed her purse and ran across Garland Road. Additionally, in her sworn statement to police, Taylor stated that after she was on the ground, Lewis grabbed her purse and ran away.

Mraz testified he saw Lewis crossing Garland Road at a rapid pace toward Taylor, who was at the door of Arby's. Lewis then had Taylor on the ground in the parking lot and was trying to drag Taylor around the side of the Arby's building. When Lewis noticed the headlights from Mraz's vehicle, he released Taylor, grabbed her purse, and ran across Garland Road. Mraz did not lose sight of Lewis until after he had been apprehended and placed in custody.

According to Lewis's testimony, when he saw Taylor exiting Arby's he went quickly across Garland Road toward her. Taylor threw her purse down. He grabbed Taylor's hand when he saw a vehicle's headlights. Lewis then ran across Garland Road to a parking lot where he was taken into custody by Mraz. Lewis testified he had been arrested for robbery in circumstances similar to the circumstances of this case. He testified that when he had taken purses from women

in the past, he had a drug problem. Lewis acknowledged at trial that he had a crack cocaine problem at the time of the alleged robbery of Taylor, and he had smoked crack cocaine and consumed alcohol for hours before his encounter with Taylor.

We conclude the evidence is sufficient to support the conviction of robbery. Both Taylor and Mraz testified that Lewis attacked Taylor, took her purse, and ran across the street. While Lewis contends he did not take Taylor's purse, the fact finder is entitled to judge the credibility of witnesses and can choose to believe all, some, or none of the testimony presented by the parties. *See Chambers*, 805 S.W.2d at 461. We defer to the jury's determinations of witness credibility. *Brooks*, 323 S.W.3d at 899. Based on the direct and circumstantial evidence, a rational trier of fact could have found beyond a reasonable doubt that Lewis assaulted Taylor with the intent to obtain or maintain control of Taylor's purse and the contents of her purse. We resolve Lewis's first point of error against him.

### Instructions on Involuntary and Voluntary Intoxication

In his second point of error, Lewis argues he was egregiously harmed by the trial court's (1) failure to include an instruction on the affirmative defense of involuntary intoxication in the guilt-phase jury charge and (2) inclusion of an instruction in the guilt-phase jury charge that voluntary intoxication does not constitute a defense to the commission of a crime. Lewis did not request that the trial court include an instruction on involuntary intoxication in the guilt-phase jury charge, nor did he object to the absence of an involuntary intoxication instruction in that charge. Lewis argues on appeal that the trial court was required to *sua sponte* include an involuntary intoxication instruction in the guilt-phase jury charge because the affirmative defense of involuntary intoxication was raised by the evidence at trial. Lewis further argues on appeal that inclusion of the instruction on voluntary intoxication in the guilt-phase jury charge

–10–

might have caused the jury to conclude Lewis's hallucinations could not constitute a defense at all.

We review claims of jury charge error under the two-pronged test set out in *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985) (op. on reh'g). We first determine whether error exists. *Ngo v. State*, 175 S.W.3d 738, 743 (Tex. Crim. App. 2005). If error exists, we then evaluate the harm caused by the error. *Id.* The degree of harm required for reversal depends on whether that error was preserved in the trial court. When error is preserved in the trial court by timely objection, the record must show only "some harm." *Almanza*, 686 S.W.2d at 171. By contrast, unobjected-to charge error requires reversal only if it resulted in egregious harm. *See Neal v. State*, 256 S.W.3d 264, 278 (Tex. Crim. App. 2008).

"Intoxication" is defined in the penal code to mean "disturbance of mental or physical capacity resulting from the introduction of any substance into the body. TEX. PENAL CODE ANN. § 8.04(d) (West 2011). Penal code section 8.04(a) provides that "[v]oluntary intoxication does not constitute a defense to the commission of crime. TEX. PENAL CODE ANN. § 8.04(a). Intoxication is voluntary if the accused has exercised independent judgment or volition in taking the intoxicant. *Torres v. State*, 585 S.W.2d 746, 749 (Tex. Crim. App. [Panel Op.] 1979); *see also Taylor v. State*, 885 S.W.2d 154, 158 (Tex. Crim. App. 1994) (if there is evidence from any source that might lead a jury to conclude defendant's intoxication somehow excused his actions, voluntary intoxication instruction is proper).

The Court of Criminal Appeals has held that involuntary intoxication may constitute an affirmative defense to the commission of a crime. *Torres*, 585 S.W.2d at 749; *Hanks v. State*, 542 S.W.2d 413, 416 (Tex. Crim. App. 1976). The affirmative defense of involuntary intoxication is encompassed within the insanity defense prescribed in the penal code. *Mendenhall v. State*, 77 S.W.3d 815, 817–18 (Tex. Crim. App. 2002); *see also* TEX. PENAL CODE

–11–

ANN. § 8.01(a) (West 2011) (it is affirmative defense to prosecution that, at time of the conduct charged, the actor, as a result of severe mental disease or defect, did not know his conduct was wrong). There are two elements: (1) the accused exercised no independent judgment or volition in taking the intoxicant, *Torres*, 585 S.W.2d at 749, and (2) as a result of a "severe mental disease or defect" caused by the involuntary intoxicant, the accused did not know that his conduct was wrong. *Mendenhall*, 77 S.W.3d at 817–18. The affirmative defense of involuntary intoxication is limited to instances when the defendant is unaware of what the intoxicating substance is, is under duress or force, or has taken medically prescribed drugs according to the prescription. *Shurbet v. State*, 652 S.W.2d 425, 428 (Tex. App.—Austin 1982, no pet.).

There is ample evidence Lewis was voluntarily intoxicated. He testified he drank alcoholic beverages and smoked rocks of crack cocaine. Lewis relies on his testimony that he believes the cigarette he smoked at the crack house was "laced" with PCP or some other chemical as evidence his intoxication was involuntary. Lewis testified that although he had smoked crack cocaine for many years, he had never experienced the hallucinations of hearing and seeing dead relatives in his mind before the incident at issue here, and he attributed the hallucinations to a drug that must have been added without his knowledge to the cigarette he smoked at the crack house. Even if Lewis's speculative testimony raised a fact issue as to whether he, while voluntarily smoking crack cocaine and consuming alcoholic beverages, nonetheless had exercised "no independent judgment or volition" in ingesting PCP or some other drug when smoking the cigarette, the evidence did not permit a rational jury to conclude that it was the intoxication from the cigarette, as opposed to his voluntary intoxication from crack

–12–

cocaine and alcohol, that had caused his hallucinations or that Lewis had not known robbing Taylor of her purse was wrong.[1] *See* TEX. PENAL CODE ANN. § 8.01(a).

At trial, Lewis did not assert that his admitted drug problem with crack cocaine constituted a defense to any criminal offense. Neither did Lewis argue at trial that, as a result of his drug and alcohol intoxication on the date of the incident, he did not know his conduct was wrong. Instead, at trial Lewis testified he did not intend to rob Taylor of her property and he did not hit, kick, or punch Taylor, nor did he pull her hair or drag her by her leg or arm. Lewis testified that his sole reason for approaching Taylor and grabbing her arm was that he was hallucinating from a cigarette he smoked that was, unbeknownst to him prior to smoking it, purportedly laced with some drug, and he believed Taylor might help him.[2] Lewis did not assert or introduce evidence that he did not know his conduct was wrong because he was suffering from involuntary intoxication as a result of smoking a cigarette laced with a drug. Rather, Lewis's defense and his testimony was that, other than grasping Taylor's arm because he wanted her to help him, he did not intend to assault or rob Taylor of her property.

As he acknowledges, Lewis did not request a jury instruction on an affirmative defense of involuntary intoxication, much less argue a theory at trial that because of involuntary intoxication, he did not know that assaulting Taylor and taking her purse were wrong. Consequently, the trial court could not have erred in failing to *sua sponte* submit a jury instruction based on that affirmative defense. *See Posey v. State*, 966 S.W.2d 57, 62 (Tex. Crim. App. 1998). In any event, the affirmative defense of involuntary intoxication was not raised by the evidence because the evidence did not permit a rational jury to conclude that it was

---

[1] *See Alexander v. State*, No. 03-01-00263-CR, 2002 WL 436993, at *3 (Tex. App.—Austin Mar. 21, 2002, no pet.) (not designated for publication) (ample evidence defendant was voluntarily intoxicated where he told police he drank alcoholic beverages and soda mixed with codeine cough syrup and smoked marihuana cigarettes; defendant's statement he did not know whether the marihuana cigarettes were "laced" did not raise issue of involuntary intoxication).

[2] The jury charge included the lesser-included offense of assault. However, the jury found Lewis guilty of robbery.

intoxication from the cigarette, as opposed to voluntary intoxication from ingesting crack cocaine and alcohol, that caused Lewis's hallucinations or that Lewis did not know that his conduct was wrong.

Lewis complains on appeal that the trial court erred by submitting an instruction and definition in the jury charge under penal code section 8.04 that "[v]oluntary intoxication does not constitute a defense to the commission of a crime," and "'[i]ntoxication' means disturbance of a mental or physical capacity resulting from the introduction of any substance into the body.'" *See* TEX. PENAL CODE ANN. § 8.04(a), (d); *Skinner v. State*, 956 S.W.2d 532, 543 (Tex. Crim. App. 1997) (penal code section 8.04(a) bars the use of evidence of voluntary intoxication to negate the culpable mental state of a crime); *Taylor*, 885 S.W.2d at 158 (defendant need not rely upon voluntary intoxication as a defense in order for the charge to properly contain a section 8.04(a) instruction).[3] Lewis asserts the charge might have caused the jury to conclude his hallucinations could not constitute a defense at all. At trial, Lewis did not object to the instruction. The instruction correctly states the law as it applies to voluntary intoxication. In light of Lewis's own testimony, the trial court reasonably could have concluded a juror might believe voluntary intoxication excused Lewis's actions. Accordingly, the voluntary intoxication instruction was proper in this case. *See Taylor*, 885 S.W.2d at 158.

We conclude there was no error by the trial court in failing to *sua sponte* include an instruction on involuntary intoxication in the guilt phase jury charge. We also conclude there is insufficient evidence to support an affirmative defense of involuntary intoxication. Specifically, the evidence did not permit a rational jury to conclude that it was the intoxication from the cigarette, as opposed to his voluntary intoxication from crack cocaine and alcohol, that caused

---

[3] *See also Contreras v. State*, No. 05-05-00570-CR, 2005 WL 352872, at *7 (Tex. App.—Dallas Dec. 27, 2005, no pet.) (not designated for publication) (regardless of whether defendant advanced a defense based on voluntary intoxication, there was evidence he was intoxicated so it was appropriate for trial court to instruct jury that voluntary intoxication is not a defense to commission of a crime).

his hallucinations or that Lewis did not know that his conduct was wrong. Finlly, we conclude the trial court's instruction based on section 8.04(a) of the penal code was proper in the guilt-phase jury charge based upon record evidence indicating Lewis was voluntarily intoxicated. We resolve Lewis's second point of error against him.

## Ineffective Assistance of Counsel

In his third point of error, Lewis asserts he received ineffective assistance of counsel at trial when his trial counsel failed to request a guilt-phase jury charge instruction on involuntary intoxication.

To succeed on a claim of ineffective assistance of counsel, a defendant must show that counsel's performance was deficient and prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *Menefield v. State*, 363 S.W.3d 591, 592 (Tex. Crim. App. 2012) (citing *Goodspeed v. State*, 187 S.W.3d 390, 392 (Tex. Crim. App. 2005)). The first prong requires the defendant to show counsel's performance fell below an objective standard of reasonableness under prevailing professional norms. *Strickland*, 466 U.S. at 687–88, 689; *Ex parte Lane*, 303 S.W.3d 702, 707 (Tex. Crim. App. 2009). The second prong requires the defendant to show there is a reasonable probability that, but for his counsel's errors, the result of the proceeding would have been different. *Strickland*, 466 U.S. at 694; *Ex parte Lane*, 303 S.W.3d at 707.

In determining whether a defendant has met his burden, we consider the totality of the representation and the particular circumstances of each case. *Ex parte Lane,* 303 S.W3d at 707. Our review of counsel's performance is highly deferential and we strongly presume counsel's conduct fell within the wide range of reasonable professional assistance and do not judge counsel's actions in hindsight. *Strickland*, 466 U.S. at 689; *Andrews v. State*, 159 S.W.3d 98, 101 (Tex. Crim. App. 2005); *Thompson v. State*, 9 S.W.3d 808, 813 (Tex. Crim. App. 1999). We commonly assume a strategic motive for counsel's actions if any can be imagined. *Andrews*,

159 S.W.3d at 101. The fact that another attorney might have pursued a different strategy at trial is insufficient to prove counsel was ineffective. *Scheanette v. State*, 144 S.W.3d 503, 509 (Tex. Crim. App. 2004).

An ineffective assistance claim must be "firmly founded in the record," and the record must affirmatively demonstrate the claim has merit. *Menefield,* 363 S.W.3d at 592; *Goodspeed*, 187 S.W.3d at 392; *see also Ex parte Martinez*, 330 S.W.3d 891, 901 (Tex. Crim. App. 2011) ("Allegations of ineffectiveness must be based on the record, and the presumption of a sound trial strategy cannot be overcome absent evidence in the record of the attorney's reasons for his conduct."). In most cases, a silent record that provides no explanation for counsel's actions will not overcome the strong presumption of reasonable assistance. *See Rylander v. State*, 101 S.W.3d 107, 110–11 (Tex. Crim. App. 2003). Direct appeal is usually an inadequate vehicle for raising an ineffective assistance claim because the record is generally undeveloped. *Menefield,* 363 S.W.3d at 592–93. Counsel should ordinarily be afforded an opportunity to explain her actions before being denounced as ineffective. *Id.* at 593. "If trial counsel is not given that opportunity, then the appellate court should not find deficient performance unless the challenged conduct was 'so outrageous that no competent attorney would have engaged in it.'" *Id.* (quoting *Goodspeed*, 187 S.W.3d at 392).

In this case, Lewis did not file a motion for new trial raising an ineffective-assistance-of-counsel claim and there is no record of a postjudgment hearing regarding a claim of ineffective assistance of counsel. Consequently, trial counsel did not have the opportunity to explain her actions, including any strategic reason for not requesting that the trial court submit a jury instruction on the affirmative defense of involuntary intoxication.

Although a defendant is entitled to an affirmative defense instruction on every issue raised by the evidence of the case, *Warren v. State*, 565 S.W.2d 931, 933–34 (Tex. Crim. App.

[Panel Op.]1978), counsel is not obligated to request a particular instruction merely because the defendant is entitled to it. *Dannhaus v. State*, 928 S.W.2d 81, 86 (Tex. App.—Houston [14th Dist.] 1996, pet. ref'd). The proper test for determining whether counsel's representation was deficient is whether it was objectively unreasonable for counsel not to ask for it. *Id.* (citing *Strickland*, 466 U.S. at 686). Because there is no evidence of counsel's strategy or the methods involved in reaching her decisions, there is no evidence to show a deficiency in counsel's representation and we presume that counsel's strategy was a sound one. *See Thompson*, 9 S.W.3d at 813; *see also Gutierrez v. State*, 8 S.W.3d 739, 749 (Tex. App.—Austin 1999, no pet.) (recognizing trial counsel's failure to request an amendment to the jury charge as a possible sound trial strategy).

Because the evidence shows voluntary intoxication resulting from ingestion of crack cocaine and alcoholic beverages, Lewis's counsel could have made the strategic decision not to pursue an involuntary intoxication defense. Further, because Lewis's defensive theory and testimony was that he did not intend to assault and rob Taylor of her property, we can imagine a strategic decision by defense counsel that an involuntary intoxication instruction would undermine his defensive claim that no robbery was intended or committed. Further, as discussed above with regard to Lewis's second point of error, the evidence is insufficient to support an affirmative defense of involuntary intoxication *See Spriggs v. State*, 878 S.W.2d 646, 650–51 (Tex. App.—Corpus Christi 1994, no pet.). Lewis's counsel cannot be found ineffective for not requesting a jury charge to which Lewis was not entitled. *See Hardin v. State*, 951 S.W.2d 208, 211 (Tex. App.—Houston [14th Dist.] 1997, no pet.).[4]

---

[4] *See also Salmeron v. State*, No. 05-12-00360-CR, 2013 WL 1320509, at *5 (Tex. App.—Dallas Mar. 27, 2013, pet. ref'd) (not designated for publication).

We conclude Lewis failed to rebut the presumption that counsel's decision was reasonable and, therefore, failed to establish error under the first prong of *Strickland* on this complaint. We resolve Lewis's third point of error against him.

**Court Costs**

In his fourth point of error, Lewis requests we reform the trial court's judgment to delete the requirement that he pay court costs because the clerk's record does not contain a bill of costs. If a criminal action is appealed, "an officer of the court shall certify and sign a bill of costs stating the costs that have accrued and send the bill of costs to the court to which the action or proceeding is . . . appealed." TEX. CODE CRIM. PROC. ANN. art. 103.006 (West. 2006). Costs may not be collected from the person charged with the costs until a written bill, containing the items of cost, is produced and signed by the officer who charged the cost or the officer entitled to receive payment for the cost. *Id.* art. 103.001.

The clerk's record in this case did not contain a copy of the bill of costs. In light of Lewis's specific complaint that the clerk's record did not contain a bill of costs, we ordered the Dallas County District Clerk to file a supplemental clerk's record containing the certified bill of costs associated with this case, and the clerk did so. *See* TEX. R. APP. P. 34.5(c)(1) (rules of appellate procedure allow supplementation of clerk's record if relevant item has been omitted). Lewis's complaint that the evidence is insufficient to support the imposition of costs because the clerk's record did not contain a bill of costs is now moot. *See Coronel v. State*, No. 05-12-00493-CR, 2013 WL 3874446, at *4 (Tex. App.—Dallas July 29, 2013, no pet. h.) (citing *Franklin v. State*, 402 S.W.3d 894, 895 (Tex. App.—Dallas 2013, no pet.)). We resolve Lewis's fourth point of error against him.

In response to the Court's orders requiring supplementation of the record, Lewis filed motions in which he objects that the bill of costs in the supplemental clerk's record is not a

"proper bill of costs" and the bill of costs was not filed in the trial court or brought to the trial court's attention before costs were entered in the judgment.

With respect to his first objection, Lewis argues the bill of costs in the record is not a "proper bill of costs" because it consists of "unsigned, unsworn computer printouts."  The code of criminal procedure requires only that a bill of cost be certified and signed "by the officer who charged the cost or the officer who is entitled to receive payment for the cost," "stating the costs that have accrued" if the cause is appealed.  TEX. CODE CRIM. PROC. ANN. art. 103.001, .006. Here, the district clerk provided a "Bill of Costs Certification" containing the costs that have accrued to date in Lewis's case; it is certified and signed by the deputy district clerk.  We conclude the supplemental record filed by the clerk meets the mandate of the code of criminal procedure. *See Coronel*, 2013 WL 3874446, at \*4.

With respect to his second objection, Lewis complains that there is no indication the bill of costs was filed in the trial court or brought to the trial court's attention before costs were entered in the judgment.  However, there is no requirement that a bill of costs be presented to the trial court at any time before judgment.  *Id*. at \*5.  We deny Lewis's motions objecting to the supplemental record.

Finally, we note that in his original brief and his objection to the bill of costs, Lewis does not challenge the propriety or legality of the specific costs assessed; therefore, we do not address these matters.

### Modification of Judgment

In his fifth point of error, Lewis requests the judgment be reformed to accurately reflect the statute he was found to have violated.  This Court has the power to modify an incorrect judgment to make the record speak the truth when we have the necessary information before us

–19–

to do so.  TEX. R. APP. P. 43.2(b); *French v. State*, 830 S.W.2d 607, 609 (Tex. Crim. App. 1992); *Asberry v. State*, 813 S.W.2d 526, 529–30 (Tex. App.—Dallas 1991, pet. ref'd).

The judgment recites that the statute Lewis was found to have violated was Texas Penal Code § 29.09.  However, the record is clear that Lewis was tried and convicted of robbery, and the statute addressing that offense is Texas Penal Code § 29.02.  *See* TEX. PENAL CODE ANN. § 29.02 (robbery statute).

We resolve Lewis's fifth point of error in his favor.  Accordingly, we reform the judgment to reflect the statute Lewis was found to have violated is section 29.02 of the penal code.

## Conclusion

As modified, we affirm the trial court's judgment.

/Robert M. Fillmore/
ROBERT M. FILLMORE
JUSTICE

Do Not Publish
TEX. R. APP. P. 47

120837F.U05



## Court of Appeals
## Fifth District of Texas at Dallas

# JUDGMENT

MICHAEL WAYNE LEWIS, Appellant

No. 05-12-00837-CR    V.

THE STATE OF TEXAS, Appellee

On Appeal from the Criminal District Court No. 6, Dallas County, Texas,
Trial Court Cause No. F11-50889-X.
Opinion delivered by Justice Fillmore,
Justices Bridges and Lewis participating.

Based on the Court's opinion of this date, the judgment of the trial court is **MODIFIED** as follows:

The judgment is modified to reflect the statute Michael Wayne Lewis was found to have violated is Texas Penal Code section 29.02.

As **MODIFIED,** the judgment is **AFFIRMED**.

Judgment entered this 31st day of October, 2013.

/Robert M. Fillmore/
ROBERT M. FILLMORE
JUSTICE